UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| PAUL BOWARY, M.D., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES MEDICAL LICENSING EXAMINATION, NATIONAL BOARD OF MEDICAL EXAMINERS, and THE FEDERATION OF STATE MEDICAL BOARDS OF THE UNITED STATES, INC., <br><br> Defendant. | Case No. 1:21-cv-00278-JJM-LDA |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Paul Bowary, M.D. ("Dr. Bowary") has twice failed Step 3 of the United States Medical Licensing Examination ("USMLE"), an examination that Rhode Island and other jurisdictions in the United States rely upon for purposes of medical licensure. As discussed further below, the USMLE assesses an examinee's ability to apply knowledge, concepts, and principles, and to demonstrate fundamental patient-centered skills, that constitute the basis of safe and effective patient care. Step 3 is the final examination in the USMLE sequence and, if passed, generally leads to a state license to practice medicine without supervision.

Rather than retaking the Step 3 examination after his two failed attempts, Dr. Bowary was found to have provided an altered score report to the Rhode Island Department of Health ("RIDOH") that reflected a passing score, along with a cover email that was purportedly sent to him by defendant National Board of Medical Examiners ("NBME"). He was licensed to practice medicine in Rhode Island on the basis of these falsified documents.

Following an investigation and hearing in which Dr. Bowary participated with counsel, the USMLE Committee for Individualized Review ("CIR") concluded that Dr. Bowary engaged in irregular behavior by falsifying his Step 3 score report to reflect a passing score and fabricating an email to support the authenticity of the falsified Step 3 score report. As a sanction for this irregular behavior, Dr. Bowary was barred from retaking the USMLE Step 3 examination for three years. This decision was upheld on appeal by the USMLE Composite Committee.

Dr. Bowary now seeks a mandatory preliminary injunction that would either require defendants NBME and the Federation of State Medical Boards ("FSMB")[1] to either (1) inaccurately report to the Rhode Island Board of Medical Licensure and Discipline (the "RI Medical Board" or "BMLD") that he passed the Step 3 examination, or (2) disregard the determinations of the USMLE CIR and the USMLE Composite Committee, allow Dr. Bowary to immediately sit for the Step 3 exam, and—if he passes—have that scored reported to the RI Medical Board. In other words, Dr. Bowary seeks an immediate, court-ordered pathway to resume practicing medicine[2] despite the fact that—following reasonable notice and an opportunity to be heard at two levels of review, while represented by counsel—he was found to have engaged in fraudulent and unethical behavior in an attempt to obtain professional licensure.

---

[1] USMLE is a putative defendant in this case, but it is not a corporate entity and does not have the capacity to sue or be sued. NBME and FSMB jointly own the USMLE program.

[2] Effective October 15, 2020, Dr. Bowary entered into a Voluntary Agreement Not to Practice Medicine with the RIDOH "until (1) USMLE determines that [he] has successfully passed the USMLE Step 3 examination, or (2) [Dr. Bowary] notifies the [RI Medical Board] in writing that he wishes to terminate this Consent Order and his agreement not to practice medicine, in which case [Dr. Bowary] will not return to practicing medicine until the seventh day following the date he submits that written notice to the Board." *See* Declaration of David Johnson ("Johnson Decl.") at Ex. B, p. 5, ¶ 4. Dr. Bowary was licensed to practice after submitting the fabricated Step 3 score report to the RIDOH, and the RIDOH has apparently allowed him to retain his licensure status, at least for the time being. *See id.*, p. 3, at ¶ 11.

Dr. Bowary is not entitled to such extraordinary relief. He has not shown a clear likelihood of prevailing on the claims he relies upon in his motion,[3] he does not need preliminary injunctive relief from this Court to avoid his alleged harm, his alleged irreparable harm is largely unsupported and unduly speculative in any event, and he has not shown that the balance of equities or public interest factors tip in his favor. For all of these reasons, Dr. Bowary's motion for preliminary injunction should be denied.

## BACKGROUND

### I.     NBME, FSMB, and the USMLE

NBME is a private, not-for-profit organization whose mission is to protect the health of the public through the development and administration of high-quality assessments of the knowledge and skills of health professionals. Decl. of Amy Buono ¶ 4 ("Buono Decl.").

FSMB is a private, not-for-profit organization whose members consist of state medical and osteopathic regulatory boards (commonly referred to as state medical boards) within the United States and its territories. Johnson Decl. ¶ 2. FSMB supports its member boards as they fulfill their mandate of protecting the public's health, safety, and welfare through the proper licensing, disciplining, and regulation of physicians. *Id.* NBME and FSMB jointly own the USMLE program, and a USMLE Secretariat supports the USMLE program on behalf of NBME and FSMB. Buono Decl. ¶¶ 3, 6.

The USMLE is a standardized examination used to evaluate applicants' competence for medical licensure. *Id.* ¶ 2. It is designed to assess an examinee's ability to apply the knowledge and demonstrate the fundamental skills that constitute the basis of safe and effective patient care.

---

[3] Dr. Bowary's Amended Complaint asserts nine causes of action. His preliminary injunction motion, however, relies only on two of those claims: breach of contract, and breach of the implied contractual duties of good faith and fair dealing.

*Id.*  Licensing authorities across the U.S. rely upon the USMLE in evaluating the qualifications of individuals seeking an initial license to practice medicine.  *Id.* ¶ 7.

Three "Step" exams make up the USMLE, taken at different times in the graduate medical education process:  Step 1, Step 2 Clinical Knowledge ("Step 2 CK"), and Step 3.  *Id.* ¶ 8.  Step 1 assesses whether candidates can apply basic science concepts that are important to the practice of medicine.  *Id.*  Step 2 CK assesses an examinee's ability to apply medical knowledge, skills, and understanding of clinical science essential for the provision of patient care under supervision.  *Id.*  And Step 3 assesses whether candidates can apply medical knowledge and understanding of biomedical and clinical science essential for the unsupervised practice of medicine.  *Id.*

A rigorous process is used for scoring all Step examinations, including a double-scoring method involving independent scoring systems, to ensure accurate results.  *See* Declaration of Carol Morrison, Ph.D. ("Morrison Decl.") ¶¶ 5-6.  Although examinees may request a score recheck, to date, the score recheck process has never resulted in a score change.  *Id.* ¶¶ 11-12; *see also* Buono Decl. Ex. A at 22.  A recheck will be performed if an examinee submits a written request for a score recheck and pays a service fee to the registration entity (for Step 3, FSMB is the registration entity).  Morrison Decl. ¶ 11; Buono Decl. Ex. A at 22.  The registration entity must receive the written request for a score recheck no later than 90 days after the score in question was released.  Buono Decl. Ex. A at 22.

## II.    USMLE Policies and Procedures Regarding Irregular Behavior

USMLE applicants must familiarize themselves with the USMLE Bulletin of Information.  Buono Decl. Ex. A at 3.  When examinees apply to take a USMLE Step examination, they certify and acknowledge that they have read the most current version of the

Bulletin, are familiar with its contents, and agree to abide by the policies and procedures therein. *See* Johnson Decl. ¶ 6 and Ex. A thereto.

The Bulletin of Information addresses irregular behavior and notes the USMLE program policies and procedures that apply when such behavior is suspected. Irregular behavior includes any action by applicants, examinees, potential applicants, or others that could compromise the validity, integrity, or security of the USMLE examination process. Examples include seeking, providing, or obtaining unauthorized access to examination materials, taking an examination for someone else or engaging someone to take the examination for you, altering or misrepresenting examination scores or outcomes, and failing to cooperate fully in an investigation of a suspected violation of USMLE rules. *See* Buono Decl. Ex. A at 24.

If the USMLE program receives information suggesting that an individual has engaged in irregular behavior, it conducts an investigation. *Id.* at 25. Individuals who are the subject of an investigation will be advised of the matter and will have an opportunity to provide information that they consider relevant. *Id.*

Irregular behavior cases are decided in the first instance by the USMLE Committee for Individualized Review ("CIR"). *See* Buono Decl. Ex. B at 2 ¶ B.3. Individuals who are suspected of irregular behavior have the opportunity to appear in person before the CIR, to submit information they believe to be relevant, and to be represented by counsel. *Id.* Ex. B at 2 ¶ B.4; *id.* Ex G, Ltr. at 3. And if the CIR concludes that irregular behavior occurred, the affected individual may appeal that decision to the USMLE Composite Committee. *Id.* ¶ 30 and Ex. B at 3 ¶ B.8.

If it is determined that an examinee engaged in irregular behavior, information regarding this determination becomes part of the examinee's permanent USMLE history. Buono Decl. Ex.

B at 2-3 ¶ B.5.  His score report and USMLE transcript will contain a notation of the finding of irregular behavior, and the USMLE program will provide information about the irregular behavior to third parties that receive or have received the examinee's transcript and may also report the finding to other legitimately interested parties, as determined by the USMLE program. *Id.*  An examinee found to have engaged in irregular behavior may be barred from taking future examinations, and/or special administrative procedures or conditions may be implemented for future examinations.  *Id.* Ex. B at 3 ¶ B.7.

### III.    Dr. Bowary and the USMLE

According to the Amended Complaint, Dr. Bowary is a citizen of the country of Lebanon and a resident of the State of Rhode Island.  Amended Complaint ¶ 1.  He graduated with a degree in allopathic medicine from the American University of Beirut Faculty of Medicine in 2014.  He was certified by the Education Commission for Foreign Medical Graduates ("ECFMG") to participate in a medical residency program in the United States, and he completed a psychiatry residency program at Brown University.  *Id.* ¶ 15-16, 23.

Dr. Bowary took and passed Step 1, Step 2 CK, and Step 2 CS[4] of the USMLE.  *See* Buono Decl. ¶ 14.  He took Step 3 on April 8, 2018, and he failed.  Morrison Decl. ¶ 8.  The minimum passing score was 196, and Dr. Bowary received a score of 192.  *Id.*  His performance on all subjects fell in the range of "lower performance" to "borderline performance."  *Id.* Ex. A. His score of 192 ranked him at the 5th percentile, meaning that 95% of the examinees who took the Step 3 exam between January 1, 2018 and December 31, 2018 received a higher score than Dr. Bowary.  *Id.* ¶ 8.

---

[4] Step 2 CS is a clinical skills component of the USMLE that was suspended in May 2020 due to the COVID-19 pandemic and subsequently discontinued.  *See* Buono Decl. ¶ 8 n.1.

Dr. Bowary applied to retake the Step 3 test between May 1, 2018 and October 31, 2018, but he ultimately did not test during this period and sought a refund of his test registration fees. Buono Decl. ¶ 16.  He reapplied on November 20, 2018 and took the exam on December 28, 2018, but he again failed.  Buono Dec. ¶ 17.[5]  This time, he received a score of 178, well below the minimum passing score of 196 and lower than the first time he tested.  Morrison Decl. ¶ 9 and Ex. B.  Dr. Bowary's score of 178 ranked him at the 1st percentile, meaning that 99% of the examinees who took the Step 3 exam between January 1, 2018 and December 31, 2018 received a higher score than Dr. Bowary.  *Id.* ¶ 9.  There is no dispute regarding the accuracy of this score.

On January 23, 2019, Dr. Bowary applied to take Step 3 a third time and sought to test between February 1, 2019 and July 31, 2019; however, he did not test during this period.  Buono Decl. ¶ 18.  Dr. Bowary sought a refund of his test registration fees on July 31, 2019.  *Id.* ¶ 18 and Ex. D.

On March 5, 2020, Dr. Bowary sent an email to FSMB regarding his April 2018 USMLE Step 3 score.  Buono Decl. ¶ 19.  According to Dr. Bowary's email, he received a letter by email from webmail@nbme.org in July 2019 informing him that his April 2018 Step 3 score had been rechecked and he passed the examination.  *Id.* Ex. E.  He attached the putative revised score report to his email to FSMB, bearing his name and USMLE number, a Step 3 exam date of April 8, 2018, and a passing score of 199, along with a screenshot of the July 8, 2019 email that he supposedly received from NBME.  *Id.*  Dr. Bowary also sent this communication to the Rhode Island Department of Health ("RIDOH").  *Id.* ¶ 20 and Ex. F.

---

[5] Dr. Bowary asserts in his brief that "the reporting of his examination score" from his December 2018 exam was "delayed."  Pl. Br. 6 (citing Bowary Aff. ¶ 21).  He does not explain why this purported delay is relevant, but it is not an accurate assertion in any event.  According to NBME's records, his December 2018 Step 3 score was available within the time within which candidates are told scores will ordinarily be reported.  *See* Morrison Decl. ¶ 10.

By letter dated April 27, 2020, the Office of the USMLE Secretariat informed Dr. Bowary that evidence was available that he may have engaged in irregular behavior by altering his Step 3 score report and presenting it to FSMB, NBME, and the RIDOH as authentic.  Buono Decl. ¶ 21 and Ex. G.  Among other things, the April 27 letter discussed Dr. Bowary's March 5, 2020 email to FSMB, explained that NBME had no record of sending him an email on July 8, 2019, and confirmed that there was no record of Dr. Bowary requesting a recheck of his April 8, 2018 score.  *Id.*  Dr. Bowary was informed that "all pertinent information will be reviewed by the USMLE Committee for Individualized Review."  *Id.*  He was given an opportunity to submit an explanation and any other information he deemed relevant to the USMLE Committee for Individualized Review ("CIR") by June 1, 2020.  *Id.*  He also was given the option of appearing in person before the CIR, with or without legal counsel.  *Id.*  The USMLE Secretariat provided Dr. Bowary with a copy of its policies and procedures regarding irregular behavior as part of the April 27 communication.  *Id.*

Dr. Bowary, through counsel, provided letters dated May 26, 2020 and June 26, 2020 to be included in his CIR file.  Buono Decl.  ¶¶ 22 and 24 and Exs. H and J.  Dr. Bowary also sent an email directly to the USMLE Secretariat.  *Id.* ¶ 23 and Ex. I.  All this material was provided to the CIR.  *Id.* ¶ 25.  Dr. Bowary then participated in an August 20, 2020 virtual hearing with the CIR, represented by counsel.  *Id.* ¶ 26.

The CIR determined that Dr. Bowary engaged in irregular behavior.  Buono Decl. ¶ 27.  The USMLE Secretariat explained this decision to Dr. Bowary in a letter dated September 23, 2020.  *Id.* ¶ 28 and Ex. K.  The CIR found the irregular behavior was sufficiently serious to warrant barring Dr. Bowary for a minimum of three years from taking a future administration of the USMLE.  *Id.*  After that time, Dr. Bowary may be able to test if the USMLE program

receives a request to allow him to sit for the examination from a U.S. medical licensing authority, after full disclosure of the events that led to imposition of the bar. *Id.* The CIR decision was reported to the FSMB Data Center as well as to ECFMG, the RIDOH, Tracey Guthrie, M.D. (Residency Training Director at Brown University), and Dr. Bowary's lawyer. *Id.*

The USMLE Secretariat informed Dr. Bowary that he had the right to appeal the CIR decision to the USMLE Composite Committee by sending a request for appeal within 30 days, if he had a reasonable basis to believe that the CIR did not act in compliance with applicable USMLE policies or procedures or that the CIR's decision was clearly contrary to the weight of the evidence before it (although the practice at the time was to allow an appeal by any individual who requested one). Buono Decl. ¶ 30 and Ex. K.

Dr. Bowary states that he contacted the RI Medical Board about the USMLE Secretariat's September 23 letter and, at the RI Medical Board's request, "entered into a voluntary agreement not to practice medicine until the matter with the USMLE could be resolved." Bowary Aff. ¶ 30. Dr. Bowary signed the agreement on October 14, 2020. *See* Voluntary Agreement Not to Practice Medicine at 6 (available at https://health.ri.gov/discipline/MDPaulBowary.pdf and attached as Exhibit B to the Johnson Declaration). The Voluntary Agreement states, among other things, that Dr. Bowary denies "the conclusions of the CIR," was appealing the CIR's decision, and "intends to provide evidence to the CIR and [RI Medical Board] proving the accuracy and authenticity of the NBME Email and attached USMLE Step 3 Score Report." Voluntary Agreement at 5, ¶ 16.

On October 21, 2020, a new lawyer for Dr. Bowary, Dennis Grieco II, contacted the USMLE Secretariat by email, stating that he had recently been retained by Dr. Bowary to address the CIR's decision. Buono Decl. ¶ 31 and Ex. N. After confirming that Dr. Bowary

consented to the USMLE Secretariat communicating with Mr. Grieco on his behalf, the USMLE

Secretariat responded to Mr. Grieco's email message on the same day, informing him that:

> CIR decision appeals go before the USMLE Composite Committee. The next meeting of the USMLE Composite Committee is **February 10, 2021**. Personal appearances are not permitted before the Composite Committee. The decision of the Composite Committee is final.
>
> Please send your appeal letter and any other documents you wish the Committee to review in reference to your appeal to USMLESec@nbme.org no later than **<span style="color:red">January 1, 2021</span>**.
>
> The USMLE Composite Committee will be presented with all the information that was made available to the CIR, details of the case decision, and the appeal letter submitted by you. The appeal procedure is discussed in Section B.(8) of the attached document, *USMLE Policies and Procedures re: Irregular Behavior*.

(Emphases in original). *Id.* ¶ 32 and Ex. N. Mr. Grieco acknowledged receipt of this email. *Id.*

On October 22, 2020, the USMLE Secretariat received a letter from Mr. Grieco. Buono

Decl. ¶ 34 and Ex. P. Mr. Grieco stated that "Dr. Bowary, and apparently the prior attorney on

which he relied, did not recognize the extent of the issues and information confronting him and

as a result, did not address the significant information and investigation upon which the CIR

based its findings and decision." *Id.* Ex. P at 1. He faulted the USMLE's purported failure to

advise Dr. Bowary and his prior counsel of certain findings from its investigation and the "prior

attorney's lack of familiarity with the process, issues and potential results." *Id.* at 1-2. Mr.

Grieco indicated his "preliminary investigation" produced "important and relevant information,"

but he did not disclose the information in his letter, stating instead that he would "share [the

information] shortly." *Id.* at 5. He argued that the CIR's findings were "illogical," *id.*, and

requested copies of various documents, *see id.* at 6.

In response to Dr. Bowary's requests, the matter was set for appeal to the Composite

Committee, and the USMLE Secretariat sent Mr. Grieco four emails containing documentation

that was part of the CIR file. Buono Decl. ¶ 35 and Ex. P.

Mr. Grieco and Dr. Bowary missed the stated January 1, 2021 deadline for submitting materials for consideration by the Composite Committee by over five weeks.  Mr. Grieco did not submit Dr. Bowary's appeal material until February 9, 2021, at around 2:30 p.m.—the afternoon before the Composite Committee meeting.  Buono Decl. ¶ 36 and Ex. Q.  This submission was made: (1) more than four months after Dr. Bowary was informed on September 23, 2020, of the CIR's decision and the reasons underlying the decision; (2) almost four months after Dr. Bowary informed the RI Medical Board in mid-October 2020 that he was appealing the CIR's decision and "intend[ed] to provide evidence to the CIR and [the RI Medical Board] proving the accuracy and authenticity of the NBME Email and attached USMLE Step 3 Score Report;"  (3) more than three months after Mr. Grieco's October 22, 2020 appeal letter, in which he stated his intent "to submit important and substantive information for your consideration in the near future;" and (4) almost three months after the USMLE Secretariat provided Mr. Grieco with material from the CIR proceedings, including the analysis done by NBME's staff of the NBME email and the revised April 2018 Step 3 score report that Dr. Bowary claimed to have received.

Neither Mr. Grieco nor Dr. Bowary requested an extension of the submission deadline before it passed.  Buono Decl. ¶ 36.  Instead, after he submitted Dr. Bowary's appeal materials on February 9th, Mr. Grieco asked the USMLE Secretariat how Dr. Bowary's late submission "would be addressed."  *Id.* ¶ 37 and Ex. R.  Mr. Grieco also suggested that the Composite Committee could postpone consideration of Dr. Bowary's appeal.  *Id.*

Because Dr. Bowary's submission was received after the stated deadline, on the afternoon before the Committee meeting,[6] the Committee did not review the material.  *Id.* ¶ 39 and Ex. S.

---

[6] The USMLE Secretariat provides case files for the Composite Committee to review in advance of their scheduled meetings.  For the February 10, 2021 meeting, case files were shared with the Composite Committee on January 28,

By email and letter dated February 12, 2021, the USMLE Office of Secretariat informed Dr. Bowary that the Composite Committee considered the material that was part of the file as of January 1, 2021, including Mr. Grieco's October 22 appeal letter, and found that the CIR acted in compliance with applicable USMLE policies and procedures and did not make a decision that was clearly contrary to the weight of the evidence before it.  Buono Decl. ¶ 39 and Ex. S.  The decision of the CIR therefore remained in place.

## IV.    Events Following the February 12, 2021 Decision Letter

According to Dr. Bowary, "[s]ubsequent to the 2/12/21 Letter, my employment at Butler Hospital was terminated."  Bowary Aff. ¶ 39.  He also states that he received a notice dated March 23, 2021 from the United States Citizenship and Immigration Service that "due to the termination of [his] employment, the petition sponsoring [his] visa status was withdrawn [by his employer] and revoked."  *Id.* ¶ 39 and Ex. A-18.  According to the notice, revocation of the petition that sponsored his visa status "*may* leave the beneficiary without lawful immigration status and he or she *may* therefore be present in the United States in violation of the law.  As a result, the beneficiary *may* be required to depart the United States."  *Id.* Ex. A-18 (emphasis added).  The notice does not state, however, exactly what Dr. Bowary's current visa or immigration status is.  No documents have been submitted with Dr. Bowary's preliminary injunction papers addressing this issue.

On July 21, 2021, and in response to Dr. Bowary's continued insistence in this litigation that he achieved a passing score on his April 2018 Step 3 exam (as reflected in the altered score report), NBME rechecked Dr. Bowary's score on his April 2018 Step 3 exam.  This is the first time NBME has rechecked that score.  *See* Morrison Decl. ¶¶ 13-14.  The recheck resulted in the

---

2021.  Committee members had eight CIR cases to review in advance of the February 10 meeting, including Dr. Bowary's.  Buono Decl. ¶ 38.

same failing score of 192 that was reported to Dr. Bowary shortly after he took the Step 3 exam in April 2018.  *See id.* at ¶ 14.

## V.     Litigation Background

According to the state court docket, Dr. Bowary filed his initial complaint in this action in Rhode Island Superior Court on March 29, 2021, along with an *ex parte* motion to, among other things, seal the entire record of the case.  *See* Dkt. Entry 9 at 1 (certified copies of state court record).  Counsel for Dr. Bowary informed the state court that he sought this relief "so that a Complaint, expedited Motion for Injunction and supporting memorandum can be filed with the Court under seal." Dkt. Entry 9-5 at 26 of 52.  Summons were issued by the court that same day, *see id.* at 15-23, but Dr. Bowary did not serve or otherwise notify NBME or FSMB of the lawsuit at that time.[7]  Likewise, Dr. Bowary did not file an "expedited motion for injunction" at that time.  Instead, on June 16, 2021 (almost three months later), Dr. Bowary filed an amended complaint and motion for preliminary injunction  *See* Dkt. Entry 9 at 1.  NBME and FSMB removed the state court action to this Court on July 2, 2021.  Notice of Removal (Dkt. Entry 1).

## <u>ARGUMENT</u>

## I.     Dr. Bowary Is Not Entitled To The Drastic and Extraordinary Remedy Of A Mandatory Preliminary Injunction.

A preliminary injunction is an "extraordinary" remedy that should not be granted unless a plaintiff shows that the four prerequisite factors all support the requested relief.  *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008); *see also Sterman v. Brown Univ.*, No. 20-cv-358, 2021 WL 135978, at *3 (D.R.I. Jan. 14, 2021) ("The First Circuit has stated that the

---

[7]  It is not clear why Dr. Bowary did not immediately serve his state-court filings on NBME and FSMB, given the purported urgency of his situation.  He certainly knew how to communicate documents quickly when inclined to do so, as evidenced by his sending a settlement communication to the Director of the Office of the USMLE Secretariat by email and "U.S. Priority/Overnight" mail on June 28, 2021, copying the Chair and Vice Chair of the NBME Executive Board, the CEO and President of NBME, and the President and CEO of FSMB.

issuance of a 'preliminary injunction is an extraordinary and drastic remedy....'") (quoting *Voice of the Arab World, Inc. v. MDTC Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011)).   A plaintiff must make a "clear showing" that he is likely to succeed on the merits, that he is likely to suffer irreparable harm absent preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.  *Winter*, 555 U.S. at 20, 22.  "'The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity.'"  *Sterman*, 2021 WL 135978, at *3 (citations omitted).  The moving party has the burden of proving all four elements.  *Id.*

Because he seeks a mandatory preliminary injunction that would alter the status quo and award him substantive relief, the burden on Dr. Bowary is even higher.  *See Braintree Labs., Inc. v. Citigroup Global Markets Inc.*, 622 F.3d 36, 41 (1st Cir. 2010).  Dr. Bowary concedes that he has this greater burden, *see* Mem. in Supp. of Pl's. Mot. for Prelim. Inj. ("Pl. Br.") at 25-26 (addressing standard for mandatory preliminary injunction under state law), which he has not come close to meeting.

## II.    Dr. Bowary Has Not Made A Clear Showing That He Is Likely To Succeed On The Merits.

Dr. Bowary has not shown any likelihood—much less a strong likelihood—of success on the merits.  "To demonstrate likelihood of success on the merits, plaintiffs must show more than mere possibility of success—rather, they must establish a strong likelihood that they will ultimately prevail."  *Sterman*, 2021 WL 135978, at *3 (internal quotations and citations omitted).

Although Dr. Bowary asserts nine counts in his amended complaint, his preliminary injunction brief addresses only his claims for breach of contract and breach of the implied contractual duties of good faith and fair dealing.  *See* Pl. Br. 26-35.  His arguments boil down to

a contention that the defendants did not follow their own policies and procedures and acted arbitrarily and capriciously in determining that he engaged in irregular behavior, and therefore breached the testing contract and their implied duties of good faith and fair dealing. *See id.* at 28-33. More specifically, he argues that the defendants breached their contractual obligations in two ways, first "by failing to advise Dr. Bowary of the relevant findings of the USMLE's investigation," and second "by refusing to even consider the report of Dr. Hayes, Dr. Bowary's forensic IT expert, and the other evidence Plaintiff submitted [to the Composite Committee on February 8, 2021]...." Pl. Br. 30. He is wrong.

"'To succeed on a breach of contract claim under Rhode Island law, a plaintiff must prove that (1) an agreement existed between the parties, (2) the defendant breached the agreement, and (3) the breach caused (4) damages to the plaintiff.'" *Ryder v. Pearson Educ., Inc.*, 486 F. Supp. 3d 489, 500 (D.R.I. 2020) (citations omitted). Contracts also contain an implied duty of good faith and fair dealing under Rhode Island law. *Mangla v. Brown Univ.*, 135 F.3d 80, 84 (1st Cir. 1998). "'The applicable standard in determining whether one has breached the implied covenant of good faith and fair dealing is whether or not the actions in question are free from arbitrary or unreasonable conduct.'" *Doe v. Brown Univ.*, 209 F. Supp. 3d 460, 476 (D.R.I. 2016) (finding no breach of duty by Brown University in its investigation into academic dishonesty allegation), *aff'd*, 943 F.3d 61 (1st Cir. 2019). "'The implication of the duty is that the parties will act in a manner consistent with the purpose of the contract.'" *Havlik v. Johnson & Wales Univ.*, 490 F. Supp. 2d 250, 261 (D.R.I. 2007) (citation omitted), *aff'd*, 509 F.3d 25 (1st Cir. 2007).

Defendants agree with Dr. Bowary that registration for the USMLE creates a binding contract. *See* Pl. Br. 26; *see generally Johnson v. Educational Testing Serv.*, 754 F.2d 20, 25-26

(1st Cir. 1985); *Langston v. ACT a/k/a Am. Coll. Testing Program*, 890 F.2d 380, 385-86 (11th Cir. 1989). The terms of the contract are set forth in the Bulletin of Information and policies referenced therein, which Dr. Bowary acknowledged and agreed to be bound by when he applied to take the Step 3 examination. *See* Johnson Decl. ¶ 6 and Ex. A.

The 2018 Bulletin of Information, which is applicable to Dr. Bowary's April 2018 exam administration, states that individuals who are the subject of a USMLE investigation will be advised of the matter and will have an opportunity to provide information that they consider relevant. *See* Buono Ex. A at 25. There can be no legitimate dispute that this happened here. On April 27, 2020, the USMLE Secretariat informed Dr. Bowary that he was under investigation for irregular behavior based on altering the score report from his April 2018 administration of the Step 3 exam and presenting it to FSMB, NBME, and RIDOH as authentic; and that the NBME has "no record of sending an email from 'webmail@nbme.org' on July 8, 2019 to 'paul_bowary@brown.edu.'" Buono Decl. Ex. G, Ltr. at 2; Bowary Aff. ¶ 26 and Ex. A-9. He was thus told, at the outset of the investigation, that there were questions regarding the authenticity of the email that he purportedly received from NBME and whether he had falsified the score report from his April 2018 Step 3 exam.

Dr. Bowary was also informed that all pertinent information would be reviewed by the USMLE Committee for Individualized Review, he was given the opportunity to submit an explanation and other relevant information for the CIR to consider, and he was provided the opportunity to appear before the CIR, with or without counsel. *See id.* Dr. Bowary then provided information for the CIR's consideration and participated in a hearing before the CIR with counsel. *See* Buono Decl. ¶¶ 22-26 and Exs. H-J.

Defendants thus did not breach their contract with Dr. Bowary. They advised him of the matter and gave him an opportunity to submit information that he deemed relevant. Without a breach of contract, Dr. Bowary's claim for breach of the covenant of good faith and fair dealing also fails. *See Doe v. Brown Univ.*, 505 F. Supp. 3d 65, 83 (D.R.I. 2020) ("Because [plaintiff's] breach of the covenant of good faith and fair dealing claim rises with his breach of contract claim, it falls with it as well.").

Dr. Bowary nevertheless asserts that defendants breached their implied duties of good faith and fair dealing by not informing him that—in response to his claimed receipt of an email and revised Step 3 score report from NBME—NBME staff members had reviewed the email and concluded that it had been fabricated, and that this information would be provided to the CIR. Pl. Br. 32-33. He and his counsel clearly knew that the authenticity of the email and the score report were at issue, and they had ample opportunity to address both documents in their written submissions to the CIR and at the CIR hearing. Indeed, they did so, but chose not to support their arguments with any purported expert report. *See* Buono Decl. Ex. P-4 at 7-8 (May 26, 2020 Letter to the USMLE Secretariat) ("It is clear from the documents, paper trail and email strings that Mr. Bowary had initiated an inquiry with NBME after receiving his initial score for the April 2018 step 3 test. That inquiry resulted in responses from them and eventually a revised score (enclosed). The allegation that somehow Mr. Bowary fraudulently created an email in support of his revised score is insulting to Mr. Bowary and false.").

Pointing to the Policies and Procedures Regarding Irregular Behavior, Dr. Bowary asserts that defendants failed to follow their internal policies. *See* Pl. Br. at 30-35. Specifically, he complains that the CIR decision relied on information that was not set forth in the initial letter from the USMLE Secretariat informing him of the irregularity investigation. However, the

Policies and Procedures Regarding Irregular Behavior expressly note that the "CIR will consider all available pertinent information in deciding whether an individual engaged in irregular behavior, ***including the record assembled by staff, statistical analyses employed by staff (if any)***, and any explanation or other information that the individual may provide." Buono Ex. B at 2 ¶ B.5 (emphasis added). The CIR therefore properly considered not only the information from Dr. Bowary, but also the work product provided by NBME staff, including the staff analyses regarding potential email spoofing and score report inconsistencies. There was nothing unreasonable, arbitrary, irrational, or in "bad faith" relating to the CIR process. "'A voluntary association [including private educational institutions] may, without direction or interference by the courts, … adopt … rules and regulations which will control as to all questions of discipline … and its right to interpret and administer the same is as sacred as the right to make them.'" *Doe v. Brown Univ.*, 209 F. Supp. 3d at 472 (citation omitted).

In any event, Dr. Bowary's complaints about not having received notice of certain information that was provided by NBME staff to the CIR in advance of the CIR hearing are ultimately immaterial, given that he was provided (1) a detailed description of the conclusions reached by the CIR and the basis for those conclusions in the September 23, 2020 letter, *see* Buono Decl. ¶ 28 and Ex. K; (2) a copy of the staff analyses that he says he was entitled to receive in connection with the CIR hearing, *id.* ¶ 35 and Ex. P; and (3) an opportunity to appeal the CIR decision and present additional information in support of his appeal, *id.* ¶ 30. *Cf. Doe v. Brown Univ.*, 943 F.3d 61, 68 (1st Cir. 2019) ("Even assuming that these failures constitute breaches of the Code on the part of Brown, … we struggle to see the causal connection between those breaches and Doe's alleged damages, which include the academic sanctions against her."). Dr. Bowary had the right to appeal the CIR's decision, which he exercised, and the opportunity

to argue to the Composite Committee that CIR did not act in compliance with applicable policies or procedures.

Dr. Bowary, however, missed his deadline for submitting materials to the Composite Committee on appeal.  He did so not by a matter of hours or days, but by *over five weeks*. Ignoring this fact altogether in his preliminary injunction papers, Dr. Bowary now complains that defendants "refused" to consider the report from his forensic IT consultant and other unspecified "evidence," Pl. Br. 30, without noting that the USMLE Secretariat set a January 1, 2021 deadline for receipt of any additional information he wished to present to the Composite Committee, or that he failed submit his additional information, including his "expert" IT analysis, until February 9, 2021—on the afternoon before the Composite Committee was scheduled to meet. *See* Buono Decl. ¶¶ 32, 36 and Exs. N and Q.

Dr. Bowary had months to prepare and submit additional material for the Composite Committee to review, with ample opportunity to submit in a timely manner any expert report or other supplemental material he wanted to submit regarding the email and revised score report he purportedly received from NBME.  Indeed, sometime between late September and mid-October 2020, he informed the RIDOH that he intended "to provide evidence ... proving the accuracy and authenticity of the NBME Email and attached USMLE Step 3 Score Report," as reflected in his Voluntary Agreement Not to Practice Medicine, and yet he failed to do so in a timely manner by the January 1, 2021 due date.  He could also have requested an extension of his submission date, but he did not do that either.  Instead, he simply submitted his appeal materials five weeks late, and then said through his counsel that he would not object if the Composite Committee wanted to postpone consideration of the appeal.

The Composite Committee did not act unfairly or in bad faith by not considering Dr. Bowary's untimely material. *Cf. U.S. v. Locke*, 471 U.S. 84, 101 (1985) ("Filing deadlines, like statutes of limitations, necessarily operate harshly and arbitrarily with respect to individuals who fall just on the other side of them, but if the concept of a filing deadline is to have any content, the deadline must be enforced."); *Mendez v. Banco Popular de Puerto Rico*, 900 F.2d 4, 7 (1st Cir. 1990) ("Rules are rules—and the parties must play by them. In the final analysis, the judicial process depends heavily on the judge's credibility. To ensure such credibility, a district judge must often be firm in managing crowded dockets and demanding adherence to announced deadlines. If he or she sets a reasonable due date, parties should not be allowed casually to flout it or painlessly to escape the foreseeable consequences of noncompliance.").

Dr. Bowary alleges that the defendants also failed to consider other "evidence," but it is not clear what that evidence is. All information in the appeal file as of the January 1, 2021 deadline was provided to the Composite Committee, including the October 22, 2020 appeal letter from Dr. Bowary's counsel. *See* Buono Decl. ¶ 39 and Ex. S.

This case is nothing like *Dalton v. Educational Testing Service*, which Dr. Bowary discusses at length in his brief. *See* Pl. Br. at 25-26. There, a testing entity decided not to review information submitted on behalf of an examinee in a testing irregularity dispute because it determined that the information was not relevant. The court found that this was a breach of the parties' testing contract. The court's conclusion is subject to question, *see* 87 N.Y.2d 384, 394-98 (Levine, J. dissenting), but the case is inapposite in any event because there was no issue regarding the examinee's compliance with stated submission deadlines.

Dr. Bowary also cites *Tulp v. Educational Commission for Foreign Medical Graduates*, 376 F. Supp. 3d 531 (E.D. Pa. 2019), apparently for the proposition that defendants owed him a

"limited common-law duty of due process." Pl. Br. at 27. Without conceding that any statutory or common law due process principles apply here, the analysis in *Tulp* is equally inapposite. *Tulp* was before the court on a motion to dismiss, and taking as true the plaintiff's allegations that the ECFMG had allotted twenty minutes to a disciplinary hearing for plaintiff but then unilaterally terminated the meeting after "a few minutes," the court found that the complaint plausibly alleged a violation of common law due process principles. *Id.*    Here, Dr. Bowary received notice and an opportunity to participate in the CIR hearing, as well as an opportunity to provide information to CIR in advance of the hearing. He did, in fact, provide information to the CIR and participate in the hearing, and he was represented by counsel at all times (although Dr. Bowary seems to imply that he was not satisfied with that representation, Bowary Aff. ¶ 27). Dr. Bowary also received detailed notice of the CIR decision and was given the opportunity to appeal the decision to the Composite Committee.[8]  Dr. Bowary appealed the decision but then failed to meet the stated deadline for submission of his appeal materials, missing the deadline by several weeks.   The fact that the Composite Committee did not consider Dr. Bowary's egregiously late submission cannot be described as a violation of any duty, whether under contract or otherwise.

Finally, while not directly relevant to the issue now before the Court (*i.e.*, whether Dr. Bowary has shown that he is likely to prevail on his claim that defendants failed to follow their

---

[8] *Cf. Conger v. Barnhart*, 2003 WL 22961219, at *7 (D. Me. 2003) ("I turn next to the plaintiff's second point of error:  that he received constitutionally inadequate notice of the nature of the issues to be aired at his hearing, depriving him of an adequate opportunity to be heard. This point is patently meritless. From the date the plaintiff first filed his application [for SSI benefits], he was put on notice of the existence of an issue concerning his alleged fugitive-felon status, which formed the basis for denial of his claim both initially and on reconsideration. Following the initial denial, the plaintiff engaged counsel experienced in Social Security matters, who promptly sought to address the fugitive-felon issue, pressing the point that the evidence of the existence of an outstanding warrant was a clerical error. The plaintiff was notified in writing that his hearing would concern 'whether there is  a valid felony warrant pending against [him],' the very issue that the plaintiff, through counsel, had pressed on reconsideration.") (citations omitted).

policies for handling suspected incidents of irregular behavior by not informing him prior to the CIR hearing about the analysis done by NBME's IT staff), there is nothing to suggest that the CIR or the Composite Committee would have reached a different conclusion even if the report from his IT consultant were considered.  The conclusions reached by Dr. Bowary's consultant regarding the NBME IT staff analysis of the purported July 8, 2019 email focused on the covering email and  addressed the falsified score report (which is the more important document) on only a limited basis.  *See* Bowary Aff. Ex. A-15 at Ex. C.  Moreover, the CIR's decision was based on other significant factors and information, beyond either aspect of the NBME staff's analysis.

For example, there was no record of NBME sending Dr. Bowary an email on July 8, 2019 from "webmail.nbme.org."  Buono Decl. Ex. K, Ltr. at 2.  Although purporting to be a letter, the signature block does not contain the name of any NBME employee,[9] and the name of the subunit listed in the email signature — Examinee Support Services — had been changed roughly two years *prior to* July 8, 2019 (the date of the purported email), to Customer Operations Management.  *Id.*  The letter suggests that a recheck inquiry was submitted to NBME, there is no record of Dr. Bowary requesting a score recheck, and Dr. Bowary's explanation of how the score recheck supposedly came about is both implausible and at odds with the published process for requesting such a recheck.  He says that, after receiving his failing score on the April 2018 exam, he called NBME to say that he experienced severe facial pain while testing and asked NBME to take that fact into consideration.  *See* Bowary Aff. ¶¶ 19-20; *see also* Buono Ex. H at 1.  He suggested, in other words, that he performed badly on the exam because he experienced facial pain while testing.  Nothing about that statement (had it actually been made) would have

---

[9] The purported email from NBME is also attached as Ex. A-10 to Dr. Bowary's Affidavit.  This version has a name at the top (Kimberly Woodward).  It is our understanding that Ms. Woodward is the legal assistant of Dr. Bowary's counsel, and her name presumably appears because she printed that document from her computer.

suggested that he wanted to have his score rechecked (or that he had any reason to question the validity of his failing score). And if it had been viewed as a request for a score recheck, he would have been told to submit a recheck request in writing to the appropriate entity (FSMB, not NBME) and to pay the corresponding fee, per the published policy for doing so. Dr. Bowary, however, submitted no written request for a score recheck, and paid no fee to have a recheck done. *See* Morrison Decl. ¶ 13 ("If Dr. Bowary had requested a recheck of his April 2018 Step 3 score, my office would have conducted the recheck. We have no record of performing a recheck at the request of Dr. Bowary."). Dr. Bowary does not testify otherwise, *see* Bowary Aff. ¶¶ 19-20, and he stated in an email to NBME on March 26, 2020 that his purported calls to NBME after failing the April 2018 Step 3 exam were not made "to request a score recheck," Buono Decl. Ex. P-3 at 8-9. He nevertheless was asking the CIR and the Composite Committee to conclude that, in July 2019—many months after a purported call from Dr. Bowary to the NBME in which he reported experiencing ███████ on his April 2018 exam—NBME rechecked his April 2018 results, discovered an error, and sent him a revised score report reflecting a passing score.

Dr. Bowary's IT consultant cannot explain away any of these facts, and he did not attempt to do so. Nor did he have much to say about the revised score report, reflecting a passing score of 199. The report had obvious alterations, with formatting and typeface that does not match an actual score report. *See* Buono Decl. Ex. L at ¶ 2.g. The report also changed Dr. Bowary's total score without changing the performance bands for his subtests; those performance bands would have changed, however, if his score had actually changed:

> The uniqueness of the performance profile band must be recognized. Out of over 80,000 Step 3 score reports with these score categories, only that from Dr. Bowary's April 2018 attempt matches on all 21 categories. The next closest match is on only 7 categories. If Dr. Bowary's total test score were to have

> changed upon rescoring, which it surely has not, but it if were to have changed, the rescoring would have produced a different performance profile because the underlying subscores would have changed, too.

Buono Decl. Ex. L at ¶ 3.c.  Dr. Bowary's IT consultant addressed the falsified score report in two terse paragraphs of his report, discussing the fact that the properties of the falsified score report reflected use of GPL Ghostscript 9.05.  *See* Bowary Aff. Ex. A-15 at Ex. C, p. 18.  His only other statement was that the score report was not likely falsified because (in his view) the July 9, 2019 email appeared to be authentic.  *See id.*  Such empty logic cannot carry the day for Dr. Bowary.

Dr. Bowary also made at least one additional misrepresentation, as noted by the CIR.  In his email to FSMB attaching a screen shot of the purported July 2019 email and the altered score report, Dr. Bowary included a payment summary showing that he was refunded registration fees for the Step 3 exam that he had registered to take during a testing window that ended on July 31, 2019.  He represented to FSMB that the refund was that Step 3 registration was "voided" due to the change to his score for his April 8, 2018 exam administration following the purported recheck.  Buono Decl. Ex. K, Ltr. at 2; *id.* Ex. E at 1, Mar. 5, 2020 email to "usmle@fsmb.org" ("I was able to get refunded though for the attempt that I understood was voided or for the application that I eventually did not need as I received my updated score (please see attached).").  That is not what happened.  When Dr. Bowary sought a refund of his test registration fees on August 9, 2019, he provided a different explanation for not testing and seeking a refund — that he was preoccupied with renewing his visa.  *See* Buono Decl. Ex. D at 2-3 (Aug. 9, 2019 email).

Dr. Bowary has not shown a likelihood of success on the merits of his claims for breach of contract or breach of the implied covenant of good faith and fair dealing.  His preliminary injunction motion should be denied on that basis.

III.   **Dr. Bowary Has Not Shown That He Will Be Irreparably Harmed In The Absence Of Preliminary Injunctive Relief.**

Although Dr. Bowary's failure to show a likelihood of success on the merits makes analysis of the remaining preliminary injunction factors a matter of "idle curiosity," *Sterman*, 2021 WL 135978, at *3, his motion also fails because he has not shown that he faces a risk of imminent and nonspeculative irreparable harm in the absence of preliminary injunctive relief. He points to two types of alleged irreparable harm: (1) loss of employment (which has already occurred) and (2) the threat of deportation. *See* Pl. Br. 36-37. Neither supports a finding of threatened irreparable harm that would justify his requested preliminary injunction.

A.   **Dr. Bowary's Alleged Loss of Employment Does Not Constitute Irreparable Harm**

The relief Dr. Bowary is seeking in this case includes compensatory damages for his alleged loss of employment. *See, e.g.,* Amended Complaint at ¶¶ 77-78, 82-83, 88-89. "Irreparable harm most often exists where a party has no adequate remedy at law…. In this case, [plaintiff] ultimately seeks an award of pecuniary damages …. Such an award will make [him] whole. Accordingly, [his] legal remedy is adequate." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004) (internal citation omitted); *see also Sampson v. Murray,* 415 U.S. 61, 90 (1974) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.'") (citation omitted); *Sterman v. Brown Univ.*, 2021 WL 135978, at *8 ("'Irreparable injury' in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy.") (internal quotations and citation omitted).

-25-

To support his contrary argument, Dr. Bowary compares his situation to the plaintiff in *Jouria v. ECFMG*, 2010 WL 4556603 (Pa. Com. Pl. 2010), an unpublished case from the Court of Common Pleas of Pennsylvania, Philadelphia County.  *See* Pl. Br. at 35-37.  In *Jouria*, the plaintiff engaged in irregular behavior while seeking certification by the Educational Commission for Foreign Medical Graduates of his qualifications as an international medical school graduate to enter U.S. graduate medical education.  The irregular behavior consisted of submitting inauthentic letters of recommendation with his application for residency programs in the United States.  2010 WL 4556603, at *268.  The ECFMG decided to permanently revoke the plaintiff's ECFMG certificate, thereby foreclosing plaintiff from ever participating in a medical residency program in the United States.  Plaintiff sought and obtained a preliminary injunction reinstating his ECFMG certificate.

Dr. Bowary is not in the same position as the *Jouria* plaintiff.  Dr. Bowary has not been permanently barred from taking the USMLE without further recourse.  After three years, the bar may be lifted if a U.S. medical licensing authority submits a request to allow Dr. Bowary to sit for the test, after full disclosure of the events leading to the bar.  Dr. Bowary therefore is already in a position similar to that afforded the plaintiff by the *Jouria* court's preliminary injunction; after an appropriate three-year suspension, "the medical program leaders" will decide whether Dr. Bowary should be able to take the Step 3 examination, notwithstanding his irregular behavior.  *See* 2010 WL 4556603, at *272.  Moreover, and as discussed further below, Dr. Bowary has already reported the finding of irregularity to RIDOH and the RI Medical Board, which have allowed him to retain his medical license until the issues concerning his USMLE Step 3 examination score can be resolved.  *See* Voluntary Agreement Not to Practice Medicine at 4, ¶ 17, and 5, ¶¶ 4, 5 (*see* Johnson Decl. Ex. B).

There are other distinctions between Dr. Bowary and Dr. Jouria. Dr. Bowary's wrongdoing is far more serious than Dr. Jouria's falsification of letters of reference. Dr. Bowary was found to have falsified the score he achieved on an exam that state medical authorities rely upon to help determine the qualifications of prospective physicians to deliver safe and effective medical care. The falsified score report led to him being licensed to practice medicine in Rhode Island, despite the fact that he has twice failed to demonstrate the level of medical knowledge and competence needed to pass the exam. *See* Voluntary Agreement at 3, ¶ 11. The *Jouria* court's reasoning that "no other person or institution" would suffer harm as significant as the harm confronting Dr. Jouria in the absence of injunctive relief is troubling enough in the context of that case, where the court minimized the significance of the alleged unethical conduct and effectively second-guessed the appropriate sanction. But that court's reasoning does not apply here in any event, where Dr. Bowary seeks a preliminary injunction that would require NBME to immediately and inaccurately report a passing score for him on the USMLE Step 3 exam despite the fact that he has not actually passed the exam, or to allow Dr. Bowary to immediately take an exam that the USMLE Composite Committee has concluded he may not retake for at least three years.[10]

## B. Dr. Bowary's Alleged Risk of Deportation Does Not Constitute Irreparable Harm

Dr. Bowary's other "irreparable harm" argument also fails. His brief asserts that Dr. Bowary "is at grave risk of being deported in the near future if the [RI Medical Board] is not provided with a passing USMLE Step 3 score." Pl. Br. at 37. "Counsel's factual assertions in

---

[10] It may also be noted that the *Jouria* court's preliminary injunction did not simply preserve the status quo at it existed when the motion was filed, it required the defendant to revert to the status quo that existed "before the acts complained of in the complaint." 2010 WL 4556603, at *269, 270. This is not generally the purpose of a preliminary injunction. *See CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc.*, 48 F.3d 618, 620 (1st Cir. 1995) ("The purpose of a preliminary injunction is to **preserve** the status quo, freezing an existing situation so as to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs.") (citation omitted; emphasis added).

pleadings or legal memoranda," however, "are not evidence and do not establish material facts." *Jupiter v. Ashcroft*, 396 F.3d 487, 491 (1st Cir. 2005). Dr. Bowary has provided no evidence of his current immigration status, or even addressed whether or how he is lawfully in the country at the present time despite having lost his job at Butler Hospital. He makes passing reference to a 60-day regulatory period in which an applicant on a H-1B visa can seek an extension of stay based upon a change of employment, Pl. Br. at 38, but more than 60 days have passed since he received the USCIS's March 23, 2021 letter stating that his petition for non-immigrant worker status had been revoked based upon his termination of employment by Butler Hospital. *See id*. at 37-38 and Ex. 18.

Likewise, Dr. Bowary has provided no evidence that his alleged risk of deportation is non-speculative or imminent. He provides no timeline for his alleged deportation and no discussion of whether he has obtained or could obtain another job or a different visa to prevent deportation, assuming that a visa requires him to have both medical licensure (which he still has, *see* n.11 *infra*) and current employment. He has simply asserted that he is at "grave risk" of being deported. *See* Pl. Br. at 37. "Speculative injury does not constitute a showing of irreparable harm." *Public Serv. Co. of New Hampshire v. Town of West Newbury*, 835 F.2d 380, 383 (1st Cir. 1987); *see also Lopez v. Wall*, No. CA 09–578–S, 2011 WL 3678686, at *2 (D.R.I. Aug. 22, 2011) (preliminary injunction denied where plaintiff failed to "show any imminent danger of immediate and irreparable harm"); *Turner v. City of Boston*, 760 F. Supp. 2d 216, 218 (D. Mass. 2011) (preliminary injunction not warranted where there was no imminent threat of irreparable harm).

Indeed, Dr. Bowary's claim that he risks suffering imminent irreparable harm is belied by his own actions. Dr. Bowary received the Composite Committee's decision on February 12,

2021. He did not seek a preliminary injunction, however, until June 2021, more than eight months after entering into his Voluntary Agreement Not to Practice Medicine following the CIR's finding that he had engaged in irregular behavior, four months after learning of the Composite Committee's decision on appeal, and more than three months after filing his initial court complaint in March 2021. "[D]elay between the institution of an action and the filing of a motion for preliminary injunction, not attributable to intervening events, detracts from the movant's claim of irreparable harm…. The longer the delay, the more pervasive the doubt." *Charlesbank Equity Fund II v. Blinds to God, Inc.*, 370 F.3d 151, 163 (1st Cir. 2004) (internal citation omitted); *Gorman v. Coogan*, 273 F. Supp. 2d 131, 134 (D. Me. 2003) ("'Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights … tends to indicate at least a reduced need for such drastic, speedy action.'") (citations omitted).

To the extent Dr. Bowary claims irreparable harm from his loss of employment, *see* Pl. Br. at 37, this has been the status quo since at least October 15, 2020. At that time, Dr. Bowary entered into a voluntary agreement with the RI Medical Board not to practice medicine "until the issues concerning his USMLE Step 3 Examination score can be resolved." Johnson Dec. Ex. B at 4 ¶ 17. He did not file his state court action until more than five months later, and he did not file his motion for preliminary injunction until eight months after entering into the agreement with the RI Medical Board. Dr. Bowary may argue that he was pursuing an appeal before the Composite Committee during some of this time, but he was notified of the Composite Committee decision on February 12, 2021, and he did not file his motion for preliminary injunction in state court until almost four months after the February 12 decision.

To the extent Dr. Bowary claims irreparable harm from the possibility of deportation, he has also delayed.  He received notice from USCIS on March 27, 2021 that the petition for non-immigrant worker status had been withdrawn by his employer and revoked, and that this might affect his visa status, but he did not file a motion for preliminary injunction until almost three months later.  If Dr. Bowary truly believed that he would be irreparably harmed in the absence of emergency relief, he should have immediately pursued a preliminary injunction and immediately provided notice to defendants, but he did neither.  *See Quince v. Orchard Valley Citizens Assoc. v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989) ("'Although a particular period of delay may not raise to the level of laches and thereby bar a permanent injunction, it may still indicate an absence of the kind of irreparable harm required to support a preliminary injunction.'") (citations omitted).

Moreover, defendants are not aware of any federal court case outside of a direct immigration action holding that the risk of deportation constitutes irreparable harm, and no such case has been cited by Dr. Bowary.  Even in the immigration context, the Supreme Court has held that "[a]lthough removal is a serious burden for many aliens, it is not categorically irreparable…."  *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see also American-Arab Anti-Discrimination Committee v. Ashcroft*, 241 F. Supp. 2d 1111, 1114 (C.D. Cal. 2003) ("While the deportation or removal or an individual is a serious consequence, it appears to be the very consequence the law contemplates.  A legal consequence under the law has not been shown to constitute an irreparable injury.").

Dr. Bowary also suggests as an additional element of his claimed risk of irreparable harm that, if deported to his "home country of Lebanon, he will be subject significant social and professional stigma and discrimination and may present a real danger of physical harm to him and his partner," because he is "now a partnered gay man."  Pl. Br. 39.  His predictions,

however, are speculative and therefore insufficient to establish irreparable harm. *See Taylor v. Connecticut Dep't of Corrections*, 2005 WL 8174479, at *2 (D.R.I. 2005) ("[T]he harm cannot be speculative, and subjective apprehensions and predictions cannot establish an immediate threat of irreparable harm.") (citation omitted). Furthermore, the harm he predicts is a perceived threat of harm from deportation, not from actions within defendants' control. This collateral threat is the legal consequence of his current immigration status, and it does not constitute irreparable harm. *See American-Arab Anti-Discrimination Committee*, 241 F. Supp. 2d at 1114. Finally, Dr. Bowary does not address whether he might be able to practice medicine or obtain related employment in another country, to the extent he fears what might happen to him if he returned to Lebanon.

Any risks relating to Dr. Bowary's deportation to Lebanon are appropriately addressed by way of the U.S. immigration system and laws, not by way of a preliminary or permanent injunction in a dispute between private parties. Indeed, the Court has previously noted that it has limited authority to impact deportation decisions if the relevant federal agency is not before the Court, and Dr. Bowary has made no effort to join any such agency in this litigation.

Dr. Bowary also appears to have other options for avoiding his claimed risk of irreparable harm, to the extent he has concerns regarding his licensure status and ability to practice medicine in Rhode Island. He notes in his brief that the RI Medical Board can grant licensure based upon successful performance on an exam other than the Step 3 exam, and that the RI Medical Board would accept a Canadian licensure exam "as an alternative to the USMLE Step 3." Pl. Br. 23. He says it is uncertain when he could take that exam, *id*. at 24, but the existence of such alternative paths to continued licensure undermines Dr. Bowary's contention that he would suffer his alleged harm absent the requested preliminary injunction.

**C.    Dr. Bowary Has Not Shown that Either of His Alternative Forms of Preliminary Injunctive Relief Would Prevent The Alleged Risks of Irreparable Harm.**

Assuming, for the sake of argument, that Dr. Bowary had shown a clear likelihood of success on the merits and that he risks suffering irreparable harm absent a preliminary injunction, it would still be appropriate to deny his requested injunction.   He has offered no evidence that the interim relief he is seeking from the Court would result in him getting a new job as a physician or retaining his current medical license.

Dr. Bowary has asked the Court to order the defendants to either (1) "immediately" report the passing score that he purportedly received from NBME to the RI Medical Board as his official score, "so that Dr. Bowary can resolve any medical licensure issues and ensure they do not prevent a change in his immigration status that would permit him to remain in this country and work as a psychiatrist for another employer;" or (2) "permit Dr. Bowary to sit for [the] USMLE Step 3 exam immediately, and upon passage of that exam, immediately report that passing score to the [RI Medical Board,]" again so that it can resolve any medical licensure issues.  *See* Pl. Br. 40-41.   But there is no evidence that would allow the Court to conclude that the RI Board of Medicine would treat such a passing Step 3 score report as sufficiently definite to warrant any change in the current state of affairs, under which Dr. Bowary has retained his medical license[11] but has agreed not to practice medicine until the "issues concerning his USMLE Step 3 Examination" have been "resolved."  *See* Voluntary Agreement at 3, ¶ 17.   A preliminary injunction is just that—a preliminary decision that remains in place only until the

---

[11]  Dr. Bowary asserts that "a license is required to practice medicine in the State of Rhode Island, R.I. Gen. Laws § 5-37-2, and as a result, medical licensure is an absolute requirement for Dr. Bowary to obtain a change of status for a H-1B visa in order to maintain his lawful immigration status and remain in the United States legally."  Pl. Br. at 38; *see also id.* ("[I]n order for that change of status to be granted for an H-1B visa, Dr. Bowary must have a license to practice medicine in Rhode Island.").  But Dr. Bowary already has a license to practice medicine in Rhode Island. *See* Johnson Decl. Ex. B at 1 (Voluntary Agreement Not to Practice Medicine) ("Paul Bowary, MD ... is a physician licensed pursuant to R.I. Gen. Laws § 5-37-1 *et seq.* and holds license number MD17092.").  He has agreed, for the time being, not to resume practicing medicine, but his license was not revoked or suspended.  It remains "active." *See* https://healthri.mylicense.com/Verification/Details.aspx?agency_id=1&license_id=621403&.

case can be decided on the merits.  The RI Medical Board will presumably recognize this fact and might well decline to treat the preliminary injunction as resolving whether Dr. Bowary has a valid, passing Step 3 score.  If it does so, the requested preliminary injunction will accomplish nothing.  This is another reason to deny Dr. Bowary's requested relief.  He has not shown, as he must, that the drastic and extraordinary remedy that he has requested is necessary to prevent the claimed irreparable harm.

### D.   Dr. Bowary Does Not Need Either of His Alternative Forms of Preliminary Injunctive Relief to Accomplish His Stated Objective of Allowing the RI Medical Board to Resolve the Concerns About His Step 3 Score.

According to Dr. Bowary, he is seeking a preliminary injunction so that the RI Medical Board can be the body that decides whether he merits state licensure:

> As demonstrated in detail above, Dr. Bowary clearly received an authentic email from the NBME on July 8, 2019 that notified him a rescoring of his April 8, 2008 USMLE Step 3 exam resulted in a passing score. (Supra at 18-20.) That passing score should be officially reported by the USMLE to the ... [RI Medical Board], so that Dr. Bowary can resolve any medical licensure issues and ensure they do not prevent a change in his immigration status that would permit him to remain in this country and work as a psychiatrist for another employer. Alternatively, the Defendants should be ordered to permit Dr. Bowary to sit for USMLE Step 3 exam immediately, and upon passage of that exam, immediately report that passing score to the [RI Medical Board].  That would resolve any concern about his satisfaction of the requirements for medical licensure, while allowing the [RI Medical Board], after affording Dr. Bowary the due process he did not get from the Defendants, to determine the truth about the email Dr. Bowary received from the NBME, a truth which the Defendants have purposely sought to avoid.

Pl. Br. at 40.

But Dr. Bowary does not need either of his requested forms of preliminary injunctive relief to enable the RI Medical Board to resolve the issues concerning his licensure status.  Under his Voluntary Agreement Not to Practice Medicine, which the RIDOH has consented to and ratified, Dr. Bowary agreed not to practice medicine until *either* of two things happens:  "(1) USMLE determines that [Dr. Bowary] has successfully passed the USMLE Step 3 Examination;

or (2) [Dr. Bowary] notifies the [RI Medical] Board in writing that he wishes to terminate this Consent Order and his agreement not to practice medicine, in which case [Dr. Bowary] will not return to practicing medicine until the seventh day following the date he submits that written notice to the Board." *See* Johnson Decl. Ex. B at 5, ¶ 4.  Dr. Bowary is thus free at any time to notify the RI Medical Board that he is withdrawing his consent not to practice medicine under his current Rhode Island license, and he may "return to practicing medicine" seven days after providing such notice.

It is true, of course, that the RI Medical Board might take further action upon receiving such a notice from Dr. Bowary, along the lines provided in his Voluntary Agreement Not to Practice Medicine for any breach of that agreement.  *See* Voluntary Agreement at 5-6, ¶ 5.  This further action might (or might not) include an immediate suspension of his license, but if it did he would have the right to request a hearing in accordance with the statutory and regulatory provisions appliable to such a suspension, as referenced in his Voluntary Agreement.  *See id*. This would afford him the "due process" that he purportedly "did not get from the Defendants," and that he  says he wants to obtain by having the RI Medical Board resolve any concerns regarding his Step 3 exam score.  *See* Pl. Br. 40-41.

Dr. Bowary thus does not need a mandatory preliminary injunction against defendants to accomplish his stated objective of having the RI Medical Board resolve his licensure status.  He has the keys to that outcome in his own hands, under the terms of his Voluntary Agreement Not to Practice Medicine.  A court should not provide extraordinary relief in the form of a mandatory preliminary injunction when such relief is not needed to prevent the alleged irreparable harm.

## IV.   A Preliminary Injunction Would Harm Defendants And Would Not Serve The Public Interest.

Dr. Bowary asserts, in conclusory fashion, that "[c]learly, the Defendants would not be harmed by the [requested preliminary injunction] and thus the balance of interests between the parties certainly weighs in favor of granting Dr. Bowary's motion." Pl. Br. 40.  He has not made any argument, however, as to *why* the balance of interests weighs in his favor, and he ignores the public interest factor altogether.  *See id.* at 25-40.

Dr. Bowary's failure to meaningfully address two of the four requisite factors for a preliminary injunction is fatal.   "A failure by the plaintiff to meet any one of the four requirements requires a denial of the motion."  *Figueroa v. Wall*, No. C.A. 05-415-T, 2006 WL 898166, at *2 (D.R.I. Mar. 14, 2006); *see also Winter*, 555 U.S. at 22 (plaintiff must make a "clear showing" that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest).  And the omission is particularly noteworthy here, given the issues at stake.

Defendants would be harmed if they were required to report a passing score for Dr. Bowary that he did not earn on the Step 3 examination, or if they were to allow him to immediately sit for the Step 3 examination despite a finding that he altered a USMLE score report.   Licensing authorities across the country rely on the USMLE to help evaluate the qualifications of individuals seeking an initial license to practice medicine.  If defendants are forced to report an unearned passing grade to Rhode Island licensing authorities, they are not performing their fundamental role, and the value of the USMLE program is degraded.   *Cf. Powell v. NBME*, 364 F.3d 79, 88-89 (2d Cir. 2004) ("As administrator of the national exam used by a number of states for licensing medical doctors, the National Board has a duty to ensure that its examination is fairly administered to all those taking it."); *San Mateo Union High Sch.*

*Distr. v. Educational Testing Serv.*, No. 13-3660, 2013 WL 4711611, at *15 (N.D. Cal. 2013) ("Forcing Defendants to validate AP exam scores resulting from improperly administered tests would place them in the untenable position of having to act contrary to their obligations in the *AP Bulletin*, and also would result in colleges and universities being less likely to rely on the integrity of such scores."); *see generally Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 284 (4th Cir. 2002) ("The entire preliminary injunction inquiry, and particularly the requirement that the district court carefully balance the harms to the parties, is intended to ensure that the district court 'choose[s] the course of action that will minimize the costs of being mistaken.") (citation omitted). Likewise, if defendants are required to allow Dr. Bowary to immediately sit for the Step 3 examination despite his serious misconduct, defendants' authority to decide and implement appropriate sanctions would be undermined.

The public interest is also significantly affected and strongly favors the defendants. Dr. Bowary seeks an order requiring defendants to report that Dr. Bowary achieved a passing score on an exam that measures minimum competency to practice medicine unsupervised, when he has in fact failed the exam twice and thus failed to demonstrate his knowledge and competencies in areas that the State of Rhode Island deems necessary to warrant licensure. This might permit an unqualified individual to return to the unsupervised practice of medicine, to the detriment of patients who trust that all individuals who practice medicine have the requisite minimum competencies to do so safely. And his request to immediately retest removes a sanction that was imposed after serious irregular behavior was found to have occurred relating to performance on a licensure exam, thereby eroding the deterrent effect of such sanctions and the public's interest in valid exam results and ethical physician behavior. *See* Johnson Decl. ¶ 9 ("The sanctions reinforce the importance of ethical behavior, which state medical boards, the public, and

individual patients expect from medical professionals and those applying for licensure."); *cf.* RI Gen L § 5-37-5.1(1) (2012) (stating that the "[f]raudulent or deceptive procuring or use of a [medical] license" constitutes "unprofessional behavior," for which various sanctions can be imposed under RI Gen L § 5-37-6.3 (2012)).

## **CONCLUSION**

The Court should deny Dr. Bowary's motion for preliminary injunction.

Dated:  July 23, 2021.                          Respectfully submitted,

                                                /s/ Stacey P. Nakasian

                                                _____
                                                Stacey Nakasian (Bar No. 5069)
                                                SNakasian@duffysweeney.com
                                                Duffy & Sweeney, Ltd.
                                                321 South Main Street, Suite 400
                                                Providence, RI 02903-7109
                                                Telephone:  401-455-0700
                                                Facsimile:   401-455-0701

                                                Robert A. Burgoyne - *pro hac vice*
                                                RBurgoyne@perkinscoie.com
                                                Caroline M. Mew - *pro hac vice*
                                                CMew@perkinscoie.com
                                                Perkins Coie LLP
                                                700 13th St., N.W., Suite 800
                                                Washington, DC 20005-3960
                                                Telephone: 202-654-6200
                                                Facsimile:  202-654-6211

                                                Attorneys for Defendants NBME and FSMB

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 1, 2021, I electronically e-filed the foregoing ***redacted*** document(s) and that they are available for viewing and downloading from the Court's CM/ECF system, and that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>/s/ Stacey Nakasian</u>