**EXHIBIT B**

```
1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF RHODE ISLAND

3

4     * * * * * * * * * * * * * * * *  C.A. NO. 21-278-JJM
                                    *
5    PAUL BOWARY, M.D.              *
                                    *
6        VS.                        *  AUGUST 30, 2021
                                    *  2:00 P.M.
7    UNITED STATES MEDICAL          *
     LICENSING EXAMINATION, et al   *
8    * * * * * * * * * * * * * * * *  VIA VIDEOCONFERENCE

9

10          BEFORE THE HONORABLE JOHN J. McCONNELL, JR.,

11                        CHIEF JUDGE

12
```

(Motion for Preliminary Injunction)

**SEALED**

```
15   APPEARANCES:

16   FOR THE PLAINTIFF:    DENNIS T. GRIECO, II, ESQ.
                           Grieco Law
17                         70 Jefferson Boulevard, Ste. 301
                           Warwick, RI  02888
18
     FOR THE DEFENDANT:    ROBERT M. DUFFY, ESQ.
19                         Duffy & Sweeney, Ltd.
                           321 South Main Street, 4th Floor
20                         Providence, RI  02903

21                         ROBERT BURGOYNE, ESQ.
                           Perkins Coie, LLP
22                         700 Thirteenth Street, NW
                           Suite 800
23                         Washington, D.C.  20005

24   Court Reporter:       Karen M. Wischnowsky, RPR-RMR-CRR
                           One Exchange Terrace
25                         Providence, RI  02903
```

1    30 AUGUST 2021 -- 2:00 P.M.

2    VIA VIDEOCONFERENCE

3         THE COURT:  Good afternoon, everyone.  We're

4    here today in the case of Paul Bowary v. United States

5    Medical Licensing Examination, National Board of

6    Medical Examiners, et al, 21-278, and we're here on

7    Plaintiff's motion for a preliminary injunction.

8         Would counsel identify themselves for the

9    record.

10        MR. GRIECO:  Dennis Grieco, your Honor,

11   representing the Plaintiff; and with me is Susan

12   Taylor, who is not -- had not entered an appearance in

13   this case but is the Plaintiff's immigration attorney

14   and had asked just to observe the argument this morning

15   in case it relates to anything she has to do for him

16   with immigration.

17        THE COURT:  Everything we do is public, so

18   that's no problem at all.  Welcome, Ms. Taylor.

19        MS. TAYLOR:  Thank you, your Honor.

20        THE COURT:  Mr. Duffy?

21        MR. DUFFY:  Good morning, your Honor.  Robert

22   Duffy for the Defendants, and with me is Bob Burgoyne

23   who will be handling the argument.

24        THE COURT:  Great.  Good morning, gentlemen.

25   Welcome back, Mr. Burgoyne.

1       MR. BURGOYNE:  Thank you.

2       THE COURT:  Mr. Grieco.

3       MR. GRIECO:  Your Honor, I know the parties have

4  submitted extensive memoranda to you.

5       THE COURT:  Oh, yes, you have.

6       MR. GRIECO:  And I think -- obviously, the

7  extent of both sides' memoranda reflects the

8  significance of these issues to both sides, and it

9  can't be understated the significance of your Honor's

10  decision this morning with respect to Dr. Bowary.

11       And, your Honor, as is always the case before

12  you, counsel for both sides have spent an inordinate

13  amount of energy, appropriately so, detailing all the

14  relevant law and detailing all the relevant facts.

15       Before I address some of that, your Honor, you

16  know, I'd just like to make the overall point here that

17  not only is a party's efforts before the Court, and

18  certainly we argue Dr. Bowary's efforts in the hearing

19  process before the USMLE, need to be grounded in some

20  measure of fundamental fairness; and I would just make

21  the observation here, your Honor, that despite both

22  sides' extensive and well-formed arguments, this is

23  clearly a circumstance where if Dr. Bowary is not

24  permitted to take this test, he is going to be

25  deported.

1          We have an affidavit from the attorney

2     representing him in his immigration -- with respect to

3     his immigration status.  It makes that abundantly

4     clear.

5          And what this comes down to is while we have

6     lots of claims and lots of arguments about what USMLE

7     should have done and what damage it's caused to

8     Dr. Bowary, the reality is this comes down to whether

9     it makes sense and is fundamentally fair to simply let

10    Dr. Bowary take this test so he's not deported and

11    then --

12         THE COURT:  Mr. Grieco, what legal basis is

13    presently before me that would allow -- that would

14    result in my ordering him to be allowed to retake the

15    test?

16         The only legal avenue that I could think of,

17    having read all the papers, that would get me to that

18    conclusion would be a finding based on the evidence

19    that the initial e-mail was not a forgery, was not a

20    fake; and absent being able to come to that, what legal

21    basis is there that would allow me to order the medical

22    examining board to allow the doctor to retake the test?

23         MR. GRIECO:  So I would respectfully disagree,

24    your Honor.  I don't think at this stage on a motion

25    for preliminary injunction you actually have to make --

1    and it is an irrefutable finding that that e-mail was

2    authentic.  We provided you with --

3         THE COURT:  I have to find that you have a

4    likelihood of success.

5         MR. GRIECO:  Which is exactly --

6         (Overlapping speech)

7         MR. GRIECO:  I'm sorry, your Honor.  You're

8    right.  And you have to find a likelihood of success,

9    and that is not a definitive finding.  I mean, the case

10   law is clear and the Defendants haven't argued

11   otherwise that finding there's a likelihood of success

12   on the merits, meaning, number one, one of our

13   arguments is that e-mail was authentic and, therefore,

14   you could make some finding that we can likely prove

15   that, that's not a definitive finding.

16        And I would suggest, your Honor, that the

17   evidence before the Court right now is abundantly in

18   favor of finding it's likely authentic.  You have a

19   detailed report from a forensic expert who's got

20   national, if not worldwide, qualifications who says

21   just that and really nothing to the contrary.

22        But I would take one step back.  So I think on

23   the record before your Honor, I would argue it's

24   unequivocally clear that it is likely we can prove and

25   will prove that the e-mail was authentic, and that's

1    all you have to find.

2         But I would take one step back, your Honor.  I

3    don't think you actually even have to make a finding

4    about the authenticity of that e-mail or the likelihood

5    that we're going to prove its authenticity to decide

6    the issues before your Honor right now.

7         I say that for two reasons.  Our claims upon

8    which we are seeking this preliminary injunction really

9    don't go to the merits of whether that e-mail was

10   authentic or not.  They go to whether or not USMLE and

11   the Defendants that make up USMLE breached their

12   contractual obligation to provide a hearing process

13   that comports with their own express policies.

14        THE COURT:  Stop right there, then, because, I

15   mean, I'll forecast it a little bit.  I don't believe

16   that there is sufficient evidence before me right now

17   for me to make -- I don't think you've met your burden

18   of showing me likelihood of success on the authenticity

19   or nonauthenticity of the e-mail.  So I don't think

20   that's on the table for my consideration.

21        I believe at best the evidence that's before me

22   on that issue is a wash to be determined by an

23   appropriate factfinder.  That's why I say at best it's

24   that.  And because you have the burden, you will have

25   the burden, you don't meet that barrier in my mind.

1     That's the conclusion I've come to.

2          Let's now look at the procedural aspect, which

3     is basically the underlying part of your breach of

4     contract, et al, claims.

5          If I were to find that the procedures weren't

6     properly followed, take me from that finding to the

7     remedy of either, A, ordering him -- ordering them to

8     give him another shot at the exam or, B, you know,

9     finding that he found it -- that he passed it.

10          MR. GRIECO:  So with respect to ordering --

11          THE COURT:  Let me try it this way instead, a

12    little more clearly.  Isn't the only remedy that's

13    available, if I were to find a procedural problem with

14    how this was carried out, that the procedure be redone?

15          MR. GRIECO:  No.  I would abjectly --

16          THE COURT:  Tell me why not because, I'll tell

17    you right now, in thinking about that, that's the only

18    conclusion I've come to on the issue of remedy.

19          We can go back to the underlying issue later,

20    but I just want to make that remedy connection because

21    that's what -- I'm having a hard time with that.

22          MR. GRIECO:  And that's a fair question, your

23    Honor.  And before I answer it, I understand and I

24    respect what you said about your conclusion that the

25    Plaintiff has not met the burden with respect to the

1    authenticity of the e-mail; and I'd like to, with your

2    permission, make one quick comment about that.

3         On the record before you, I would respectfully

4    disagree.  You have a report from an expert whose

5    qualifications have not been disputed in any way, shape

6    or form in this proceeding and who has, in detailed

7    fashion, demonstrated unequivocally that the e-mail was

8    authentic, and you don't have anything to the contrary.

9         I guess I shouldn't say that.  The only thing

10   you have to the contrary is the description of the

11   analysis that was done by USMLE's staff, which, again,

12   no one has submitted anything about the qualifications

13   of that staff member who did it.  So I would argue

14   their opinions are inadmissible.  You have no

15   understanding of what the qualifications are of that

16   person claiming to have the expertise to make that

17   determination.

18        So that, in and of itself, gives you an

19   admissible expert opinion that it's authentic on the

20   Plaintiff's side and nothing on the Defendant's side.

21        So for those reasons -- I understand your

22   hesitancy, Judge.  You have this one expert opinion, we

23   haven't had a trial, no one's cross-examined him.  I

24   get all that; but on the state of this record, the

25   unrefuted evidence is that it is authentic; but I

1 understand and respect your findings.

2   With respect to your question about the remedy,

3 so, Judge, this is something that neither party has

4 actually briefed.  The Defendants didn't argue that the

5 only appropriate remedy here would be to remand it, so

6 I don't have the case law to cite to you.

7   But I know and I suspect your Honor has

8 familiarity with case law certainly in constitutional

9 due process contexts where definitive relief is awarded

10 as a result of a finding there's been a due process

11 violation as opposed to just remanding it and let the

12 party that, I would argue in this case, abjectly

13 refused to comply with their own written policies that

14 would have provided a fair hearing and given them a

15 second bite at the apple.

16   How is that a fair remedy in the first place?

17 It allowed any party --

18   THE COURT:  It's the usual remedy for a due

19 process violation, is you allow the process to work its

20 way through again.  And I would assume that whatever

21 safeguards are available before the -- whoever

22 conducted -- whoever conducts the CIR and then

23 ultimately the Composite Committee would -- again, we

24 haven't discussed the substance.  We've jumped right

25 ahead to the remedy.  I just want that clear.

1       So they would do it with a full record that

2   would include all of the information with full

3   knowledge that you now have of what the Defendants'

4   position is, which may or may not be one of the bases

5   for why you find a procedural problem with the CIR

6   decision in the first place, and you get proper

7   procedure.

8       MR. GRIECO:  And, again, your Honor --

9       THE COURT:  And the proper procedure isn't -- if

10  proper procedure is followed and the same outcome

11  comes, then you have the arbitrary and capricious

12  standard or whatever other standard might be available

13  to you in reviewing it after proper procedure.

14      MR. GRIECO:  So, your Honor, I think there are a

15  number of points here.  First, as I said -- and I would

16  just argue for purposes of the record I absolutely want

17  to respond to your inquiry because I think it's a

18  relevant one, but this is not an argument the

19  Defendants have raised.  Maybe it's -- I would argue

20  that the raise-or-waive rule makes it such that we

21  shouldn't have to confront it.

22      THE COURT:  Then, to be honest with you, then I

23  should just deny your motion for a preliminary

24  injunction because neither of you addressed this -- the

25  issue of tying the remedy to the findings of breach.

1          MR. GRIECO:  Well, so, again, I would

2     respectfully -- I understand why you would respond that

3     way, but I don't think that's what the law of the

4     raise-or-waive rule would dictate here.

5          So what you're suggesting is, you're asking me

6     about a basis to deny the relief that's being

7     requested.  So it's a position the Defendants would

8     pursue.  The Plaintiffs aren't pursuing this position,

9     the Defendants are or would need to in order to seek

10    denial.

11         If it hasn't been raised by Defendants and it's,

12    therefore, waived by them, the Plaintiffs can't suffer

13    from the failure of someone to raise a position that

14    would deny the relief they're seeking.

15         That being said, your Honor, I don't want to get

16    bogged down on that.  I said I wanted to raise it for

17    the record, and I need to for reasons that I think are

18    obvious; but I want to respond to it substantively.

19         First, as I said, your Honor, I know there is

20    case law.  I can't cite one off the top of my head; but

21    there is absolutely federal and state case law, both in

22    the constitutional due process context and the ERISA

23    context where there can be substantive problems with

24    the decision made by an insurer and then there can be

25    questions about the procedure that the insurer

1    implemented.

2         And in that second circumstance, just like in

3    the constitutional due process cases, it by no means is

4    mandatory that you simply remand it.  To the contrary,

5    the case law in many circumstances specifically

6    describes there are circumstances where a remand is not

7    appropriate and that --

8         THE COURT:  And in the ERISA context, that

9    usually involves issues of conflict; and here on the

10   record that's before me, there's nothing that would

11   lead this Court to believe that if it were to require

12   that procedure be redone appropriately and consistent

13   with whatever order one came with, there's nothing

14   before me that would lead me to believe that USMLE,

15   et al, wouldn't follow the proper procedure.

16        The only time, for instance, that -- you know,

17   when that occurs is when you -- there's some element of

18   conflict that makes the proper procedure unacceptable

19   because of the underlying conflict or whatnot; but here

20   there's no evidence before me that if that were the

21   order, that that's how USMLE, et al, would operate.

22        MR. GRIECO:  So I want to be -- and I'm well

23   familiar with the conflict ERISA cases, your Honor, and

24   I believe -- and I will find for you ERISA cases where

25   there's not a conflict but there's been a demonstrated

1    procedural deficiency; and then the rule still is that

2    remand is not mandatory, and there can be circumstances

3    where relief should be awarded.  And I know that's the

4    case in the constitutional due process cases and --

5         THE COURT:  Tell me why it should be the case

6    here.

7         MR. GRIECO:  I was -- that "and" was bringing me

8    right to that, your Honor.  So there are a number of

9    reasons.

10        First, in this case, the Composite Committee --

11   forget for a minute their refusal to look at Dr. Hayes'

12   report or visit the substance of that report.  The

13   Composite Committee was unequivocally shown in the

14   initial submission in October of 2020 that the CIR had

15   failed to disclose the findings -- sorry, the USMLE had

16   failed to disclose the findings of its investigation,

17   the staff analysis of the e-mail, so that Dr. Bowary

18   would have a reasonable opportunity to respond.

19        So one of our procedural arguments about what

20   was defective about the procedure within the agency was

21   brought to the Composite Committee's attention.  They

22   don't dispute in any way, shape or form that that was

23   timely brought to their attention.

24        And not only did they not find that there was

25   that actual procedural deficiency that contradicted

1   their own policy, they just ignored it.  They didn't

2   even reach it.  They didn't discuss it.

3         So I think it's contrary to the case law, which

4   I'm happy to provide your Honor after today, but it's

5   contrary to, again, fundamental fairness and even logic

6   to say, Okay, in this instance, Composite Committee,

7   you were aware that USMLE breached its own policy in

8   failing to disclose the central piece of information in

9   evidence, the staff analysis of the e-mail, upon which

10  you imposed these sanctions.

11        You were aware of it, you knew they didn't

12  disclose it, and that Composite Committee knowing that

13  still refused to grant the doctor any relief.

14        So what you're suggesting be done, it be

15  remanded to them so they can disclose it and let the

16  process move forward, they already knew had occurred,

17  that that defect happened, and they still unfairly

18  refused to remand it to their own CIR Committee.  So

19  what you're suggesting could happen going forward

20  happened before we even showed up in court.

21        So I don't know why a party who refused to

22  correct their own procedural remedy, which, by the way,

23  is a breach of contract, it's not just some procedural

24  rule, their failure and refusal to remedy their own

25  breach of policy, of procedure, of contract and of

1   fairness, why they should get yet another bite at the

2   apple to do it, particularly in the context here where

3   Dr. Bowary doesn't have the time for this, Judge.

4           He's going to be -- you saw Ms. Taylor's

5   affidavit.  In September, he's going to get asked, Can

6   we see your unrestricted medical license?  And sometime

7   between September and sometime mid-December, if he

8   doesn't have it, it's going to be denied.  His petition

9   for change of employer is going to be denied, and he's

10  going to be deported.

11          So that's an overarching reason why they

12  shouldn't get yet another bite at the apple; but even

13  if that timeliness was there, Judge, what you're

14  suggesting -- not what you're suggesting but what

15  you're asking about is that a party like this who has

16  twice refused to comply with their own contractually

17  required procedure get a third bite at the apple.

18          At some point, and this is what I believe the

19  cases that I will provide to your Honor say, the

20  circumstances both in the ERISA context and in the

21  constitutional due process cases where the Court has

22  made the determination, and there are First Circuit

23  cases on this, that remand is not the answer and that

24  relief to be granted to the Plaintiff is the answer are

25  circumstances like this where a Defendant can't get

1    one, two, three bites at the apple because there's

2    prejudice to the Plaintiff based on their failure to

3    appropriately give fair and reasonable procedures in

4    the first place.

5         And then lastly here, Judge, I would say again,

6    and these are the circumstances that -- and because a

7    request for a preliminary injunction is equitable

8    relief, we're balancing the equities here, this is a

9    party who got an expert report that, as I argued

10   earlier, is simply unrefuted of a person with sterling

11   credentials and reputation and I would say made a

12   semantic, if not just blatantly biased, decision to

13   say, Well, you didn't give it to us by the date we

14   asked you please to give it to us, so now we're not

15   even going to look at it; and doing that in the context

16   of precluding a doctor from even taking this test for

17   three years in and of itself is outrageous.

18        Three years not being able to practice medicine

19   would be dramatically negative to any physician's

20   career, never mind one who's about to be deported.

21        And they, "they" being the Defendants,

22   absolutely knew that this was a foreign-born doctor

23   here on a visa because they know from his ECFMG profile

24   that's exactly what he is.

25        So, again, they made the initial determination

1    not to disclose the very information they were going to

2    sanction him on.  When they were told -- when the

3    Composite Committee was told that they made this

4    egregious error, they refused to remedy it then knowing

5    that their three-year ban was probably going to either,

6    at a minimum, dramatically negatively impact this

7    doctor's career and in reality there was a high

8    likelihood he was going to be deported as we now have

9    found out.

10          And then, lastly, they got the very evidence

11   they could have gotten had either the CIR and the USMLE

12   first disclosed their analysis of the e-mails or their

13   Composite Committee recognizing that it hadn't been

14   done before, had remanded it to the CIR.  That very

15   evidence they would have gotten.  Dr. Hayes' report

16   they had, and they used this semantical "we're not

17   looking at it."

18          And not only was there no deadline.  They sent

19   an e-mail saying, Please send us stuff by January 1.

20   When we submitted after January 1, because of the

21   extent of the analysis that had to be done, I, on the

22   phone and in writing, said to the USMLE secretariat,

23   the office at USMLE that handles these proceedings,

24   that if the Composite Committee needed more time to

25   review that report, we had no objection to them

1    deciding it at their next meeting.

2          So, in essence, I said, If you feel like you

3    can't review this now, then continue the matter and

4    review it a month from now, two months from now.  They

5    said no to all of that; and, therefore, the equities do

6    not weigh in favor of giving them another bite at the

7    apple and sending it back yet again for them to figure

8    out yet another sort of bias way to play "gotcha" and

9    test this doctor, number one.

10         Number two, lastly, Judge, this three-year ban

11   is Draconian because it's not just a ban you can't take

12   our test.  The USMLE's perception, if not their

13   argument, is, well, it's our test and we get to impose

14   sanctions if we think somebody did something wrong.

15         That's not all that happens here.  When you

16   can't take the test, as we've demonstrated

17   unequivocally, it is devastating to a physician's

18   career at a minimum; and in this case, it's going to

19   lead to deportation.  So in that setting the equities

20   again balance in favor of him just taking the test

21   again.

22         The USMLE, a nongovernmental agency, unlike the

23   medical licensing board here in Rhode Island, should

24   not be in a position to literally preclude a doctor

25   from ever practicing medicine.

1          Instead, it is the licensing bodies who are the

2    lawful authorities who decide if people should practice

3    medicine.  They are the entities who should decide if a

4    physician's conduct warrants them not practicing.

5          And in this case, while the Rhode Island medical

6    board has absolutely taken a position, hence the

7    voluntary agreement, that without an official passing

8    USMLE score you can't have a license, they have not

9    sought to take his license away based upon any of these

10   allegations of fraud.

11         And should they wish to do that, they're well

12   within their rights to do it.  They still have the

13   ability to do it should they change their mind down the

14   road.

15         And I would argue that if anyone is going to

16   look at this alleged conduct that has now been, again,

17   on this record irrefutably shown not to be true, that

18   the e-mail had been irrefutably on this record shown to

19   be authentic, that if anyone was going to get into

20   these allegations that Dr. Bowary concocted that

21   e-mail, it should be the medical board that has a

22   statutory and constitutionally required process that is

23   fair to parties, fair to doctors, gives them not only

24   discovery in a case, gives them the opportunity to get

25   the information that's going to be used against them to

1    support any of these allegations, but gives a full and

2    fair hearing process before a third-party hearing

3    officer, not the entity like here with USMLE where it's

4    all the same entity that is judge, jury and prosecutor.

5         And so the three-year ban, in and of itself, I

6    would argue, especially on this record, is something

7    that is just the equities weigh in favor of taking away

8    that three-year ban and letting him take the test

9    because if anyone is going to decide this physician

10   should not practice because of these allegations, it

11   should be the medical board that has a lawful and

12   statutory process to make that position.

13        THE COURT:  Let me hear from Mr. Burgoyne now

14   and focus you, Mr. Burgoyne, on the part that we've

15   kind of been assuming, which is that procedural breach,

16   and talk to you first about that, and then we'll get

17   into the remedy piece.

18        So tell me why you don't believe the Court

19   should make a finding that both in the failing to

20   disclose the staff analysis to the Plaintiff in a

21   timely fashion they haven't violated their own internal

22   policies and procedures.

23        MR. BURGOYNE:  Sure, Judge.  There are really

24   two documents relevant here, Judge.  First is the

25   bulletin of information.  Second is the policy and

1       procedure document relating to irregular behavior.

2               Both essentially say the same thing:  We will

3       alert you to the grounds for the investigation, and we

4       will tell you the relevant findings that result from

5       that investigation and give you the opportunity to

6       respond.

7               It's clear that in the April 2020 e-mail or

8       letter that was sent to Dr. Bowary, he was given nine

9       bullet points that set forth the relevant findings.

10      Within those nine bullet points included two key

11      factors:  One, we've got no record of NBME ever sending

12      you an e-mail as you allege and, two, the score report

13      attached to that e-mail is inauthentic in numerous

14      ways.

15              So he's put on notice immediately that he has

16      potentially committed an act of irregular behavior by

17      submitting to the Rhode Island Health Department an

18      inauthentic score report.

19              THE COURT:  But you must admit that a crucial

20      piece of information was missing from that April 20th

21      that was then contained in the September 2020 letter

22      and that being the three bulleted paragraphs that

23      reference the staff analysis.

24              MR. BURGOYNE:  Yes.

25              THE COURT:  And you, as the fine lawyer that you

1    are, have to acknowledge that knowledge of that

2    information by the Plaintiff here could be game

3    changing for their ability to defend themselves in a

4    timely and appropriate fashion.

5         MR. BURGOYNE:  At least two points in response

6    to that, your Honor.  One, if you look within the

7    documents, you will see that the USMLE CIR was given a

8    summary report of the findings that were made against

9    Dr. Bowary.  They included the identical nine findings

10   that were given to Dr. Bowary in the April letter.  So

11   they were given the same broad relevant findings as

12   him.

13        True, he was not provided in advance of the CIR

14   with the findings made by the staff, but I don't know

15   that you can necessarily acknowledge Plaintiff's

16   position that those were critical findings to the CIR's

17   decision.

18        THE COURT:  How could it not be?

19        MR. BURGOYNE:  Well, because, your Honor, even

20   if the e-mail was authentic -- and we don't agree that

21   it is unchallenged that that is an authentic e-mail.

22   Obviously, that's premature.  It was never an issue in

23   the PI context.  That's why we haven't come in with an

24   expert, et cetera, on that issue; but there was all

25   sorts of additional evidence showing that the score

1    report attached to that e-mail is inauthentic; and at

2    the end of the day, that's the key irregularity here.

3    He has asked a state agency to rely upon an inauthentic

4    score report.

5         So we can get sidetracked on the authenticity of

6    this e-mail and script and all that stuff, but at the

7    end of the day we are confronted with a score report

8    that is inaccurate.

9         And that was one piece of the -- the internal

10   analyses done by staff was some of the information

11   considered by the CIR but not all of the information.

12        So let me direct your attention, your Honor, to

13   an important piece of information that was included

14   within the nine bullet points but that -- and was

15   called to Dr. Bowary's attention.

16        If you look at -- Dr. Bowary, after he failed

17   this Step 3 exam a second time, he registered to take

18   the exam a third time; and when he did so, he got an

19   eligibility period that extended from February 2020, I

20   think, to -- actually February 2019 through December

21   2019 or July 31, 2019.

22        He ended up not testing.  Instead, at the end of

23   his registration period on July 31st, which is a few

24   weeks after he purportedly received this e-mail, he

25   contacts the FSMB and says, I'd like to get a refund of

1   my registration fee for the exam, my third taking of

2   the exam.

3           And the reasons he gives are extenuating

4   personal circumstances, including the fact that he's

5   been distracted trying to deal with his visa status.

6           There's no mention in his July 31st e-mail to

7   the FSMB of his having received an e-mail message from

8   NBME telling him he has a new passing score.

9           And then he sends a follow-up e-mail on

10  August 9th.  Again he makes no mention of having

11  received a few weeks earlier a score report from NBME

12  showing that he's passed the exam.

13          THE COURT:  But, Mr. Burgoyne, that's not

14  contained in the April 2020 letter.

15          MR. BURGOYNE:  Well, that information is in the

16  April letter to him.

17          THE COURT:  Where?

18          MR. BURGOYNE:  It's a discussion -- --

19          THE COURT:  Looking at ECF 9-1 at pages 8, 9 and

20  10.

21          MR. BURGOYNE:  If you look, your Honor, it is

22  the second bullet point in the April letter, and that

23  discusses the fact that when he asked for a refund in

24  July -- actually, what it points to is that in his

25  March forwarding -- two things happened, your Honor.

1    He's given two different explanations for why he asked

2    for a refund.

3         When he sent the purported revised score report

4    and the purported e-mail from NBME to the FSMB and to

5    the Rhode Island Department of Health, he told them he

6    had been given a refund by the Federation of State

7    Medical Boards because he had gotten an updated score

8    report reflecting a passing score.

9         However, when he actually got that refund back

10   in July and August and he contacted the FSMB, he said,

11   Please give me a refund.  I need that because of

12   extenuating personal circumstances relating to my visa.

13        THE COURT:  I don't see any of that -- I

14   understand that they make mention of the refund in the

15   second bullet point; but it says, You noted that the

16   refund was for the subsequent Step 3 application that

17   was voided because of the change from a fail to a pass

18   on your April 8th, 2018, Step 3 administration.

19        MR. BURGOYNE:  That's right, and that is

20   directly contradicted by the e-mails he had sent to the

21   FSMB.

22        THE COURT:  Right, but none of that's in the

23   April letter, that second part.

24        MR. BURGOYNE:  They were just summarizing the

25   factors that they had considered.

1          THE COURT:  I'm having a real hard time,

2     Mr. Burgoyne, finding, to be honest with you, that -- I

3     mean, I'm kind of jumping further along, but I did it

4     to Mr. Grieco so I'll do it with you.

5          I'm having a really hard time finding that the

6     USMLE followed its own policies and procedures in --

7     beginning with the CIR April 20th letter.

8          I think under any scenario that the failure to

9     inform the doctor of the existence of the staff

10    analysis concerning the validity of the e-mail and/or

11    the score report is a violation of your policies and

12    procedures.

13         MR. BURGOYNE:  Your Honor, let's accept that

14    proposition.  Okay?  I'm not conceding it, but let's

15    accept the proposition for present purposes.

16         So the CIR secretariat should have alerted

17    Dr. Bowary in advance of the CIR hearing and given him

18    copies of the internal staff analysis.  They didn't.

19    Okay.

20         Under their policies, one of the two grounds for

21    appealing to the Composite Committee is the CIR failed

22    to follow its procedures; and that's obviously the

23    argument they're making here, they should have followed

24    their procedures by giving us all the IT analysis that

25    was done internally.  So Dr. Bowary and his new lawyer

1    obtained those documents.

2         THE COURT:  When did they obtain those,

3    Mr. Burgoyne?

4         MR. BURGOYNE:  They obtained them in November,

5    your Honor, although the existence of those documents

6    was disclosed in September as part of the September

7    letter.  They were provided to Dr. Bowary's counsel at

8    his request as part of e-mails that went in after he

9    confirmed his representation.

10        MR. GRIECO:  Actually, your Honor, they were

11   produced after we submitted our appeal.  We submitted

12   our appeal in October, and we got them after the appeal

13   was even submitted.

14        THE COURT:  Yeah, I think Mr. Burgoyne said that

15   you got them -- they're clearly referenced in the

16   September 27th letter, and he said that you got them

17   sometime in November.

18        MR. BURGOYNE:  Yes.  So, your Honor, they got

19   them well in advance.  Now -- you know, and they got

20   them well in advance of a January 1, 2021, deadline by

21   which they were asked to submit any additional papers

22   they wanted to submit.

23        As early as October 22nd, Dr. Bowary's counsel

24   said he had already obtained important substantive

25   information that he would provide shortly.  He didn't

1    provide it shortly.  He didn't provide any additional

2    information, including this so-called critical report

3    by Professor Hayes, until the eve of the hearing before

4    the Composite Committee.

5         He had literally months to provide additional

6    evidence based on this internal IT report showing that

7    the e-mail was legitimate.

8         THE COURT:  Well, Mr. Burgoyne, let me take you

9    back for a second from the Plaintiff's perspective, and

10    then tell me where this is wrong.  I understand your

11    argument.  Actually, when we round-tabled this in my

12    chambers, we went through that very argument.  So I'm

13    not surprised that you would come up with it.  It makes

14    sense.

15         If USMLE had followed its procedures and in

16    April had turned over the documents or at least

17    referenced them so they could have been asked for, if

18    they had known of that existence, Dr. Bowary would have

19    had eight, nine months to prepare a defense before the,

20    and I'm going to put in quotes, "deadline," because I

21    know the Plaintiff challenges that term, but the

22    January 1st submission date; and instead, not getting

23    the documents until November, they only had two months.

24         So is it really fair for USMLE to rely on the

25    fact that it took them an additional month and a week

1    to be able to produce their report than what the

2    deadline, again, in air quotes, was when, in fact, the

3    Court is likely to find that it should have been turned

4    over to them in April?

5            MR. BURGOYNE:  Two things, your Honor.  First,

6    in terms of the timing, Dr. Bowary's new lawyer

7    contacts NBME or the USMLE on October 21st, and the

8    USMLE immediately confirms his representation.

9            He then asks for various documents to be

10   produced, including the internal IT analyses, and those

11   were produced on November 10th.  So it's not a month

12   plus.  It's a matter of a couple of weeks.  Fairly

13   promptly they turn over the reports.

14           The expert report is then not tendered to the

15   USMLE office of secretariat until February 9th.  So

16   we're really looking at a period there of two-plus

17   months before the report is prepared.  Had they

18   disclosed --

19           THE COURT:  Hold on, Mr. Burgoyne.  But eight

20   months before a possible finding that it should have

21   been turned over.

22           MR. BURGOYNE:  Well, it's really -- the

23   intervening step in there wasn't the January 1 deadline

24   because there was the CIR hearing.  So the proposition

25   really is that it should have been turned over in

1 advance of the CIR hearing, which I believe -- I'm just

2 trying to find that date, your Honor.  That was in

3 August 2020.

4    THE COURT:  Right.

5    MR. GRIECO:  Your Honor, I just would point out

6 the irony --

7    THE COURT:  Hold on, Mr. Grieco.  We'll get back

8 to you.  This is Mr. Burgoyne's turn.

9    MR. GRIECO:  I thought he had finished.  I

10 apologize.

11    MR. BURGOYNE:  No, I haven't finished, your

12 Honor.  You've asked a lot of questions, and I'm happy

13 to respond to all of them.

14    THE COURT:  Sure.  Appreciate it.  Go ahead.

15    MR. BURGOYNE:  Your Honor, I don't think -- I

16 mean, could you make the case that it was unfair or

17 unreasonable for the Composite Committee not to

18 consider a document that was provided to it the

19 afternoon before it was scheduled to decide

20 Dr. Bowary's case and seven others?

21    You could, but you as well as anyone knows, your

22 Honor, judges know like everyone else knows, there are

23 deadlines; and we don't think it's fair to dismiss that

24 as a polite request simply because we said, Please

25 submit your material by January 1st, 2021.

1          There was an opportunity here.  This is -- no

2     explanation has been given at any point as to why

3     information that purportedly was in hand as soon as

4     October wasn't provided to the Composite Committee

5     until February.

6          Even in the voluntary agreement not to practice

7     medicine, there's a statement that Dr. Bowary intends

8     to prove that the e-mail and the score report were

9     authentic.

10          So as early as October they've made that

11     commitment and made the statement that they've got

12     evidence already that it's authentic, yet nothing was

13     offered prior to February 9th, nor was any request

14     made.

15          Dr. Bowary's counsel said how unfair it was that

16     they wouldn't consider this information, but at no

17     point was the secretariat or was the Composite

18     Committee asked to grant an extension or to extend the

19     hearing date until the eve of the hearing.

20          And, you know, that's no different than, you

21     know, coming in at the last minute on an appellate

22     argument and filing a supplemental brief and the Court

23     saying, We're not going to consider that, you know,

24     we've got the argument tomorrow, nor are we going to

25     postpone an argument that people have been working on

1      the last -- on a case people have been working the last

2      two weeks.

3           THE COURT:  I can't imagine if this were a

4      criminal case and a Defendant came forward with

5      exculpatory information the night before a hearing a

6      Court wouldn't grant a continuance to allow it to come

7      in and be considered, and that's really what the

8      information -- I mean, look, this comes down to, right,

9      whether Dr. Bowary or someone on his behalf

10     fraudulently put together an e-mail and a score report.

11          You and your client believe the evidence is

12     clear that he did; and, therefore, I'm bothered by

13     maybe some of the procedural niceties, so to speak.  I

14     get that.  I totally understand that.

15          On the other hand, you have Dr. Bowary who

16     admits no piece of this and admits that he took certain

17     actions in compliance with what he believed and he

18     continues to believe was an actual communication from

19     the medical licensing board and they -- and, therefore,

20     the procedural parts of this have sharper edges when

21     you believe that.  Right?

22          And as I told you at the beginning of all this,

23     I have no opinion one way or the other whether -- how

24     that e-mail and score report came about, whether it was

25     through fraud or whether it was real; and, therefore,

1    as I said, because I am not convinced either way, it's

2    likely in my mind that the Plaintiff will fail on the

3    record that's before us on that issue.

4         But it does go back to whether the procedures

5    were properly followed; and, you know, I don't live in

6    your world that you clearly live in being attorneys for

7    these folks in terms of, you know, what's acceptable or

8    not within the context of USMLE.  I have to look at the

9    law.

10        The law's governed by the policies and

11   procedures and the common law of good faith and fair

12   dealing and whatnot; and it does seem to me that there

13   are procedural problems here with the Defendants'

14   initial actions back in April and that under any

15   scenario, whether it was some of his fault or not his

16   fault in asking more quickly, substantively inured to

17   the detriment of the Plaintiff here.

18        And so with all of that said, let me tell you

19   what I'm going to --

20        MR. BURGOYNE:  Your Honor, can I address two

21   points quickly?

22        THE COURT:  Absolutely.  Sure.

23        MR. BURGOYNE:  And I apologize.  One is I think

24   it's important to understand one fact which is not

25   disputed.  Dr. Bowary failed the April 2018 exam.  He

1    acknowledges that in his reply brief, and he said there

2    were extenuating circumstances.  Likewise, it's

3    undisputed he failed the December 2018 exam.

4         So at this point there's clearly no basis to

5    order NBME to report to the Rhode Island Department of

6    Health that he has a passing score.

7         THE COURT:  I agree with you.

8         MR. BURGOYNE:  So that's a nonissue.  So we're

9    really left with should you order them to allow him to

10   test immediately.

11        THE COURT:  Well, no, I think there's a third

12   alternative, which is afford --

13        MR. BURGOYNE:  Well, no, exactly, your Honor, on

14   the merits I agree.  I'm just focusing on the relief as

15   they frame it.

16        THE COURT:  I think when you hear where I'm

17   going with this, you'll --

18        MR. BURGOYNE:  Okay.

19        THE COURT:  You'll understand.

20        MR. BURGOYNE:  If you're going in that

21   direction, I don't need to beat a dead horse.  I will

22   point out there was discussion of remedy.  One of the

23   cases Plaintiff relies upon is the *Dalton* case and

24   Educational Testing Service, and that was a case where

25   the Plaintiff argued ETS promised it would consider the

1    submissions by the test taker and it failed to do so.

2          And at the end of that exercise, the appellate

3    court in New York said the appropriate remedy in this

4    case is for us to send it back to ETS in the first

5    instance, do what it told the examinee it would do.

6          And so we would certainly agree with your Honor

7    that the remedy ultimately in this case, if you were to

8    agree with the Plaintiff on the merits, would be a

9    remand for the internal processes to take place in the

10   manner that your Honor concluded if it did come to that

11   that should have been done.

12         MR. GRIECO:  Your Honor, may I be heard on that

13   point?

14         THE COURT:  No.  I'm really ready to tell you

15   where we're going, and that's precisely where we're

16   going to go, Mr. Burgoyne, where you ended.

17         I have reviewed extensive and well-done briefing

18   and heard fine arguments and reviewed all of the

19   evidence in the case; and it is clear to me that an

20   injunction, preliminary injunction, should issue.

21         The preliminary injunction is -- and I'm going

22   to ask the Plaintiff to draft a copy in consultation

23   with the Defendants on this, what it should say, but

24   will -- I don't think -- "remand" isn't the right legal

25   word but that an injunction will issue that the USMLE

1    and its affiliates should -- are required to provide

2    Dr. Bowary with the procedure set forth in its policies

3    and procedures document that begin with the Committee

4    for Individualized Review and for them to review the --

5    all of the material that the Plaintiff wishes to submit

6    in support of his position and that the remainder of

7    the policies and any appeal that comes from it should

8    then -- and rights thereunder should follow.  Period.

9         Any and all other -- and the Court finds that

10   because there's a likelihood of success in the Court's

11   opinion that the Defendant breached the contract as to

12   the policies and procedures that was afforded to

13   Dr. Bowary, that irreparable harm will come to him

14   without affording him the proper procedure by way of

15   his continued lack of license and his potential

16   deportation and that the equities balance in favor of

17   giving him proper procedure.

18        Short of that, the request for a preliminary

19   injunction is denied.  The Court does not believe that

20   it can nor should order either a retaking of the test

21   outside of the context of what the Defendants have

22   already ordered, that is, after three years, or his --

23   you know, any order to require the Board of Medical

24   Licensure in Rhode Island to accept the fact that he

25   has a passing score.  There is no likelihood of success

1    on any of the merits of those claims that would inure

2    to that remedy.

3        In addition, in consultation, Mr. Grieco, with

4    Ms. Taylor, you can craft whatever you might believe is

5    acceptable language that the Court is empowered

6    concerning any potential deportation while this matter

7    is under process before the Defendants.

8        MR. GRIECO:  So let me ask you about that, your

9    Honor, so we can do it consistent with what you're

10   suggesting.  Are you suggesting that we draft an order

11   that you enter that will prevent him from being

12   deported until -- what are you suggesting?

13       THE COURT:  I don't know the answer to that.

14   They are not before me, so I can't order that at all.

15   I said that to you all informally before, that I have

16   no powers against immigration because they're not

17   before me.

18       However, if there's language consistent with

19   what the Court's intent is that Ms. Taylor and you can

20   find acceptable that's within the powers that the Court

21   can do considering who's before it right now, then I

22   would find that acceptable in the order.

23       MR. GRIECO:  And the intent you're referring to

24   is, understanding this would not be an order on a party

25   that's not presently before you, but the intent that

1    you want us to reflect is that you don't --

2         THE COURT:  Is that while the Court is

3    continuing its proceedings in this matter, that it is

4    the Court's order that Mr. Bowary remain in this

5    country, able to work and assist in his presentation

6    before the Defendants and before the Rhode Island

7    Medical Licensing Board.

8         Again, I'm not an immigration lawyer, and I'm

9    not -- have not thought that through completely, that

10   part.  That's why I'm going to put it on you to draft

11   what's appropriate.

12        Just know that it can't be that I order him not

13   deported because they're not before me, but I think

14   Ms. Taylor can come up with language that will assist

15   her in stopping anything being done because Dr. Bowary

16   should be allowed to stay in this country while his

17   rights are being adjudicated in the medical licensure

18   piece.

19        MS. TAYLOR:  If I may, thank you, your Honor.

20   This, of course, is not ripe at this time.  We don't

21   anticipate really a final decision in his visa

22   application until perhaps December, but we appreciate

23   your thinking in this regard.

24        THE COURT:  Okay.  Thanks.  And work with

25   Mr. Grieco on language that you might find helpful down

1    the line.

2            MS. TAYLOR:  Thank you.

3            THE COURT:  And then, Mr. Burgoyne, you know, I

4    don't understand the procedures.  I don't even

5    understand the terminology that you all use.  I was

6    telling my clerks earlier that the language is so odd

7    to me of Composite Committee and the CIR Committee and

8    whatnot.

9            I don't know who's composed of it.  I don't know

10   how they're composed of it.  I don't know anything

11   other than the facts that are before me on the policies

12   and procedures that were submitted; but as I said to

13   Mr. Grieco, I'm going on the assumption that these

14   folks, the Defendants and these committees, will act in

15   good faith in terms of a proper evaluation and a proper

16   decision-making process that's consistent with what

17   your policies and procedures are because there's

18   nothing before me that would tell me otherwise that

19   they would do that.

20           MR. BURGOYNE:  Your Honor, I certainly agree

21   there's nothing to suggest they haven't done so in the

22   past and nothing suggesting that they won't do so going

23   forward.

24           It was -- you know, we have a policy in place

25   that specifically contemplates arguing that the CIR

1    didn't comply with its procedures.

2            So it gets down to a question of, you know,

3    getting information in a timely manner to the Composite

4    Committee so that it can make an informed decision,

5    which didn't happen.  Obviously, we'll respect your

6    Honor's decision in that regard going forward on

7    remand.

8            Your Honor, what happens to the case in the

9    interim?

10           THE COURT:  Well, I think it probably makes most

11   sense, unless you tell me otherwise -- I mean, I'm kind

12   of open, but I thought through that, Mr. Burgoyne, is

13   once you all agree on what that order looks like

14   granting that limited injunction, it's only a

15   preliminary injunction, so we should keep the case open

16   which will allow -- I don't know.  I guess it would

17   just allow -- we could dismiss the case and then allow

18   it to be refiled.

19           Now that I'm thinking out loud on that, it's a

20   really good point, Mr. Burgoyne.  I don't see any

21   reason, then, not to turn it into a permanent

22   injunction; and then if you want to appeal it, that

23   will give you the right to appeal it.

24           MR. BURGOYNE:  Well, I'm just mostly trying to

25   think about how to handle this in a cost-effective and

1      efficient manner for everybody.

2               THE COURT:  Yeah.

3               MR. BURGOYNE:  And we don't object to the case

4      being just placed in a dormant status while all that is

5      going on on the side.

6               It does seem to me that converting it to a

7      permanent injunction on the heels of a process that

8      didn't envision that beforehand seems problematic.  We

9      didn't get to put forward all of our evidence that we

10     would have had we contemplated that.

11              THE COURT:  Sure.  I think it makes sense.

12     We'll do similar to what we do -- we often get cases

13     where people ask us to confirm an arbitration award or

14     to order arbitration in proceedings; and assuming we do

15     that, which the law being what the law is, you often do

16     that, send it back for arbitration, we just hold the

17     case there until we're informed after the end of the

18     arbitration procedure, here at the end of whatever

19     procedures take place between the Plaintiff and the

20     Defendants, and then just wait for the parties to

21     notify us whether further action is needed.

22              MR. GRIECO:  Your Honor, can I be heard on

23     what's going to happen in terms of both the case and

24     the specifics of this injunction that's entered?

25              So in terms of holding what's going to happen

1    with the case, I would strenuously object to obviously

2    dismissal but certainly just holding it in abeyance.

3         There's a variety of reasons.  Number one, the

4    doctor has other claims, including defamation claims,

5    libel claims, which regardless of your Court's ruling

6    here are claims that are viable, have reason to go

7    forward, and there's no reason why they should be

8    stayed in the meantime, number one.

9         THE COURT:  There's a lot of reasons it could be

10   stayed.  I think for judicial economy and for the

11   economies of the parties, until the procedural aspect

12   of this is resolved in a fashion that's appropriate,

13   that it would waste parties' and judicial time to do

14   anything other than stay the remaining until this

15   procedure --

16        MR. GRIECO:  Here's why I would respectfully

17   again disagree, your Honor.  So let's assume that this

18   process goes forward and Dr. Bowary's appropriately and

19   finally fairly heard by USMLE committees and they

20   decide that he shouldn't be subject to a three-year ban

21   and they let him take the test.

22        That doesn't change the fact that their actions

23   before which we contend violated their own policies and

24   procedures and, therefore, breached their contract with

25   him have caused him damage at a minimum through libel

1    regardless of what the outcome of these remanded

2    proceedings are; and so those claims are viable no

3    matter what happens in these remanded proceedings.

4            On the other side of the coin, and this is what

5    I find -- and I think you know me well enough, your

6    Honor.  I'm not in any way trying to be disrespectful

7    to the Court.

8            THE COURT:  You never have been.  You don't have

9    to worry about that at all.

10           MR. GRIECO:  All right.  I'm worried about what

11   I'm going to say because remanding creates a quagmire

12   at a minimum, if not a difficult context in which the

13   Defendants could do anything fairly, and I say that for

14   this reason.

15           THE COURT:  They could do what?

16           MR. GRIECO:  Do anything fairly, and I say that

17   for this reason, Judge.  If they now decide on remand

18   that USMLE and the CIR breached the policies and,

19   therefore, he should be able to submit new and

20   additional evidence, then that actually helps to

21   bolster in evidence all of the claims in this case that

22   we will be going forward on no matter what happens.

23           THE COURT:  They're not going to make that

24   determination at all.  I've made that determination.

25   I have ruled and will be in the injunction that the

1    April 27th, 2020, letter was deficient in that it left

2    material matters out of the notice to Dr. Bowary; and,

3    therefore, Dr. Bowary is entitled to a redo.

4         And that means that the Plaintiff can submit to

5    the CIR and then ultimately, if need be, to the

6    Composite Committee whatever it wants in an appropriate

7    timing of those events consistent with their rules and

8    get a full and fair hearing.

9         MR. GRIECO:  Okay.  So that's the point I was

10   going to make, your Honor, which is similar to this but

11   even more dramatic.  There is literally a

12   disinclination upon this remand for the Defendants to

13   find in favor of Dr. Bowary because if they do, all

14   these claims he has pending are bolstered.  The damages

15   are extended.

16        I mean, it would be -- quite frankly, if I were

17   advising them, I'd say I don't know how you find that

18   Dr. Bowary was not guilty of this stuff because if you

19   do, you're basically admitting you shouldn't have done

20   all these things in the first place, that you damaged

21   him by doing so.

22        I mean, I don't know how -- maybe I shouldn't

23   say this out loud, but I don't know how the Defendants

24   in a further hearing process decide in Dr. Bowary's

25   favor because they will enhance the damages against

1    them.

2        THE COURT:  You already said it out loud, and I

3    think that inures against your client's best interest,

4    to be honest with you, Mr. Grieco.

5        MR. GRIECO:  I don't think it's saying anything

6    that their attorney wouldn't figure out, Judge.  If I

7    figured it out in 30 seconds, I'm sure they're going to

8    figure it out before we have a hearing.

9        THE COURT:  I have said before and I'll say it

10   again, there is nothing before the Court that leads me

11   to believe that USMLE, its attorneys and its agents

12   will do anything that violates their policies and

13   procedures and will do anything other than give a fair

14   hearing.

15       MR. GRIECO:  Despite the fact that you found

16   they already have.

17       THE COURT:  No, I found that -- to be honest

18   with you, I found that they probably made a clerical

19   error in not listing material in their April letter

20   that they should have listed.  That's what they did

21   wrong.

22       And that does not lead me to believe that USMLE

23   has it out for Dr. Bowary at any point or had it at any

24   point.  You know, I don't know why you're making me say

25   this, but I will.  I think USMLE, except for that one

1    what I'll call clerical glitch that occurred in not

2    putting that material forward, I think acted consistent

3    with good faith, and I expect them to continue to do

4    that.

5        And I just want them to do that with full

6    information, with full knowledge so that you can put on

7    a full defense before them.

8        MR. GRIECO:  Fair enough, Judge.  I'm just

9    reacting to comments you made like when they talked

10   about the January deadline here in this hearing, you

11   said I would expect a Court who got exculpatory

12   evidence the night before a hearing would hear that

13   evidence.  They didn't do that here.

14       So that's another indication of them making a

15   pretty dramatic decision contrary to what I would

16   suggest is fairness, but I respect your Honor's

17   decision.

18       The last thing I will ask is, can we have a

19   timeframe within which this hearing must occur because

20   as Ms. Taylor told you --

21       THE COURT:  Why don't you work with Mr. Burgoyne

22   and work that into the order.

23       MR. GRIECO:  Sure.

24       MR. BURGOYNE:  We'll do that, your Honor.

25   Obviously, there are regular hearings held by the -- I

1    assume the first step is to have a new hearing before

2    the CIR.  I will determine when that could occur.  And

3    then the Composite Committee, if there's a desire on

4    Dr. Bowary's part to -- if there's an adverse decision

5    and he were to appeal, I'll find out when that next

6    hearing would likely be scheduled.

7          THE COURT:  Why don't you work together on that;

8    and if there's any problem, you can come back to me.

9          MR. GRIECO:  Very well.  Thank you, your Honor.

10         THE COURT:  Ms. Taylor?

11         MS. TAYLOR:  Thank you for hearing me, your

12    Honor.  I wonder that in a case with as many issues

13    floating as this one has, would it be useful to

14    schedule a status conference perhaps in four months'

15    time so we can all come back and say what has been

16    accomplished and what is out there?  And certainly

17    we'll know more about the immigration case.

18         THE COURT:  That would be great.  Why don't we

19    do that for the end of January.  Oh, wait a minute.

20    Four months --

21         MS. TAYLOR:  December.

22         THE COURT:  Let's do that in December.

23         MS. TAYLOR:  December would be great.  That

24    would be excellent.

25         MR. GRIECO:  Thank you, Judge.

1          THE COURT:  Thanks, Ms. Taylor.  Thanks,

2     Mr. Grieco.  Anything else, folks?  And write something

3     up, Mr. Grieco, in consultation with Ms. Taylor, get it

4     to Mr. Burgoyne and Mr. Duffy, come to some agreement;

5     and if you can't come to agreement, you both know what

6     my ruling is.  You should be able to; but if for some

7     reason you can't, then submit different orders and I'll

8     sign one of them.

9          MR. BURGOYNE:  Your Honor, are you envisioning

10     simply an order, not a decision, at this point?

11          THE COURT:  I think just an order effectuating

12     that.

13          MR. BURGOYNE:  That's fine, your Honor.  Just

14     wanted to be clear.  Okay.

15          MR. GRIECO:  Thank you very much.

16          MR. BURGOYNE:  Thank you, your Honor.

17          THE COURT:  Good luck to everybody.  Thank you.

18          (Adjourned)

19

20

21

22

23

24

25

1              C E R T I F I C A T I O N

2

3

4          I, Karen M. Wischnowsky, RPR-RMR-CRR, do

5    hereby certify that the foregoing pages are a true and

6    accurate transcription of my stenographic notes in the

7    above-entitled case.

8

9           September 15, 2021

10    Date

11

12

13    /s/ Karen M. Wischnowsky_____

14    Karen M. Wischnowsky, RPR-RMR-CRR
      Federal Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25